**PUTNAM RESOURCES,**
Plaintiff, Appellant,

v.

**Ronald M. PATEMAN, et al.,**
Defendants, Appellees.

**Ronald M. PATEMAN, et al.,**
Plaintiffs, Appellees,

v.

**FRENKEL & COMPANY, INC.,**
Defendant, Appellant.

Nos. 91–1307, 91–1308.

United States Court of Appeals,
First Circuit.

Heard Sept. 6, 1991.

Decided Feb. 20, 1992.

Henry P. Monaghan, with whom Norman Roy Grutman and Grutman Greene & Humphrey were on brief, for plaintiff, appellant Putnam Resources.

Alan G. Miller, with whom Stephen J. Paris, D. Alice Olsen, and Morrison, Mahoney & Miller were on brief, for defendant, appellant Frenkel & Co., Inc.

James F. Campise, with whom Marcigliano & Campise, George Vetter, Gordon P. Cleary, Howard A. Merten, and Vetter & White were on brief, for Ronald M. Pateman, et al.

Before CAMPBELL, ALDRICH and SELYA, Circuit Judges.

SELYA, Circuit Judge.

When Virgil, some twenty centuries ago, wrote in *The Aeneid* of mankind's "accurst craving for gold," he accurately anticipated the timeless appetite undergirding the twin appeals which confront us today. The tarnished tale follows.

## I. BACKGROUND

We limn the contours of the case as reflected in the trial record, resolving occasional conflicts in a manner consistent with the jury's recension of the evidence.

Putnam Resources, Ltd. (Putnam), a Connecticut limited partnership dealing in precious metals, was a vendor to Sammartino, Inc. (SI), a Rhode Island corporation. Under a series of contracts in force between the two, Putnam stored gold at SI's premises in Cranston, Rhode Island. The gold was made available in daily allotments for SI's manufacture of fine jewelry. To facilitate this arrangement while providing needed security, a field warehouse was established under the auspices of SLT Warehouse Company (SLT). SLT would receive gold from Putnam at the field warehouse, log it in, and thereafter dole it out to SI. Putnam was to be paid for the metal as and when the manufacturer sold the jewelry which it made from the gold.

In mid–1986, Putnam's insurance broker, Frenkel & Co. (Frenkel), a New York firm, learned that Putnam's carrier was planning to cancel existing coverage. Frenkel sought a replacement policy in the London market. Its attention soon focused on Lloyd's of London. Because underwriters at Lloyd's deal through a select group of intermediaries, Frenkel found it necessary to work cooperatively with J.H. Minet & Co. (Minet), a London brokerage house. In September, Minet managed to assemble a consortium which wrote the desired insurance (Lloyd's marine policy no. 243440200). Ronald M. Pateman was the lead underwriter.[1]

In July 1987, SI's factory closed to permit the work force to take a summer vacation. The SLT warehouseman, Charles Harrison, subsequently testified that, during this interval, Walter Sammartino (Sammartino), SI's principal, sought authorization to remove quantities of gold from the

---

1. Lloyd's marine policy no. 243440200 was syndicated and, accordingly, issued by a coterie of subscribing underwriters. Each subscriber had a defined interest in the policy (the total of all subscribing interests being 100%). Though naming all the subscribers, the plaintiff sued Pateman "individually and in his capacity as representative underwriter," alleging, *inter alia,* that Pateman was "the general manager of [the subject] policy." For ease in reference, we emulate the parties and the district court, treating Pateman as if he were the sole underwriter in interest.

field warehouse far exceeding what Putnam had authorized SLT to release. Harrison testified that he did as Sammartino asked, believing that an exchange would eventually take place to replenish the inventory. When the excess gold had not been replaced by the end of July, Harrison informed his superiors at SLT about the situation. Shortly thereafter, Sammartino notified Putnam that substantial amounts of the vendor's gold were missing. After inspecting the premises and finding the cupboard virtually empty, Putnam filed claim under the Lloyd's policy for an estimated loss of $3,900,000. In October, the underwriters paid Putnam $2,000,000 on account, but noted that an investigation of the circumstances and an accounting of Putnam's inventories were still in progress.

Eventually, the underwriters denied the claim outright. Invoking diversity jurisdiction, 28 U.S.C. § 1332(a), Putnam sued on the policy in federal court. A change of venue was granted, transferring the case from the District of Connecticut to the District of Rhode Island. The case was docketed in the transferee district on April 29, 1988. Pateman answered the complaint on July 20, 1988, contending that no loss occurred during the policy period because Putnam's gold had been wrongfully misappropriated well prior to issuance of the Lloyd's policy. Additionally, Pateman pleaded two affirmative defenses, hypothesizing that, even if a loss transpired while the policy was in force, an agent infidelity exclusion in the policy barred recovery; [2] and that, in any event, material misrepresentations and omissions arising in the course of obtaining the policy negated the coverage. Pateman also counterclaimed for return of the advance payment. On September 8, 1988, Pateman sued Frenkel in Rhode Island's federal district court, alleging that, during the original negotiations, Frenkel purposely failed to disclose facts material to the underwriters' proposed assumption of the risk.

The two suits were consolidated and the case was tried to a jury. The jury exonerated Pateman from liability to Putnam, finding not only that Putnam was unable to prove an insured loss, but also that Pateman had proved both of his affirmative defenses. Finally, the jurors found that Frenkel, in procuring the policy, had intentionally concealed material facts. Accordingly, the district court entered judgment for Pateman (1) on the primary complaint (*qua* defendant), (2) on the counterclaim (in the sum of $2,000,000), and (3) on Pateman's separate complaint (in the same sum). The counterclaim defendant, Putnam, and the named defendant in the second suit, Frenkel, both appealed.

We deal first with Putnam's appeal, bifurcating our analysis to consider, initially, its argument that the court below erred in entering judgment on the counterclaim (Part II). Concluding, as we do, that the judgment on the counterclaim was responsive to the jury verdict, we thereafter consider Putnam's remaining assignments of error (Part III). That exercise completed, we turn last to Frenkel's appeal (Part IV). In the end (Part V), we affirm the defendant's verdict in Putnam's case and the $2,000,000 damage award in favor of the counterclaimant, Pateman. At the same time, we set aside the multimillion dollar verdict against Frenkel, remanding Pateman's case against the broker for a new trial.

## II. THE JUDGMENT ON THE COUNTERCLAIM

Putnam hotly disputes the district court's entry of judgment on the counterclaim, asserting that the court impermissibly exceeded the perimeters of the jury's responses. In order to place Putnam's argument into proper perspective, it is essential that we begin by recounting a panoply of critical events.

**2.** The agent infidelity exclusion eliminated coverage for any loss resulting from "infidelity, conversion and/or misappropriation" perpetrated by an agent of the insured. The insurer's claim in this respect rested on its contention that the SLT field warehouseman, Harrison, was Putnam's agent within the contemplation of the policy.

## A. *The Circumstances Surrounding the Verdict.*

The district court sent the case to the jury by means of a specially crafted verdict form which, as eventually clarified by the court and inscribed by the jury, we provide in an appendix hereto. The form was a hybrid. It combined questions (e.g., items one, two and three) with declarations (e.g., item four) and also combined statements that seemed like verdicts (e.g., items five and six) with statements that seemed like findings (e.g., item four). The form instructed the jury to determine whether Pateman was liable to Putnam. If not, the jury was to enumerate which of three delineated reasons exonerated Pateman from liability. The form also provided a space for the jury to enter its verdict as between Frenkel and Pateman, specifying the dollar amount of Frenkel's liability if Pateman prevailed. The form did not contain a similar space for entry of the jury's verdict on the counterclaim.

The omission, of course, was scarcely a bolt from the blue. For one thing, the form was a hybrid, thus putting the parties on notice to expect the unexpected. For another thing, the record shows that the district court discussed the verdict form with counsel on numerous occasions. The court repeatedly solicited counsel's advice, stressing that it was seeking ways of simplifying the jury's task. As the day of reckoning dawned, the court apprised counsel of the final design of the verdict form before actually giving it to the jurors. No one, least of all Putnam, objected to the absence of a direct request for a verdict on the counterclaim. All parties must have realized that the counterclaim was being decided. After all, more than once during on-the-record colloquy between court and counsel the judge articulated his view that, if Pateman was not liable to Putnam at all, the necessary implication of such a finding would be to require Putnam to return the $2,000,000 that Pateman had advanced on the insurance claim. Far from voicing any disagreement with, or criticism of, the district court's assumption, Putnam indicated its assent that, should the jury find Pateman not liable, it would follow automatically that Pateman would prevail on the counterclaim.[3]

And, there was more. Notwithstanding the apparent lacuna in the form, the district court, in charging the jury, left no doubt that submission of the Putnam/Pateman dispute included the counterclaim for return of the advance. The court reminded the jury that, in addition to defending the primary complaint, Pateman was "counterclaim[ing] against plaintiff Putnam for return of the two million dollars it advanced to Putnam." The court told the jury specifically that, if the jury determined the amount of the covered loss was "less than two million dollars, *then you must render a verdict for the defendant* for the difference between the loss and two million dollars." (Emphasis supplied). Putnam did not object either to the final version of the verdict form or to the court's instructions appertaining thereto.

The jury paused during its deliberations to ask whether it could specify more than one reason for finding Pateman not liable to Putnam. After consulting with all counsel, the judge responded that such a hydra-headed finding would be permissible. At the same time, the judge modified the verdict form to make it crystal clear that the jury should not consider the case against Frenkel unless it found that Pateman's nondisclosure defense had been proven vis-a-vis Putnam. Once again, Putnam registered no objection.

When done deliberating, the jury returned to the courtroom with the completed form. Examination of the sheet revealed that the jury had answered item one ("Do you find defendant Pateman liable to plaintiff Putnam?") in the negative; indicated,

---

**3.** The following exchange is representative of the dialogue:

THE COURT: If you come up with something, two million dollars or less, then it seems to me that it's almost automatic that you owe, you have to return to the Defendant any difference between what you come up with and two million dollars, isn't that the case?

MR. GRUTMAN [Putnam's trial attorney]: I understand that. . . .

in item four, Putnam's failure to show a covered loss and, additionally, Pateman's success in proving both affirmative defenses; and completed items five and six so as to award Pateman $2,000,000 against Frenkel. After polling the jurors at Putnam's request, without incident, the district court dismissed the panel. At that point the court stated:

> In accord with the responses of the jury to the questions submitted to them, the Clerk will at this time enter judgment for Pateman and others against Putnam Resources in the amount of two million dollars, interest and costs, and against Frenkel & Company in the amount of two million dollars, interest and costs.

It was only then that Putnam's trial counsel stirred. He argued that entry of judgment on the counterclaim did not necessarily follow from the jury's verdict. Rather, two interpretations of the verdict form were possible: on the one hand, the jury may in fact have found, as the court assumed, that Pateman was entitled to recover on the counterclaim; on the other hand, however, the jury, while finding Pateman not liable to Putnam, might have wished for equitable reasons to allow Putnam to keep the advance payment. The district court was unimpressed. Final judgment entered on the counterclaim.

On appeal, Putnam's paramount argument is that the counterclaim was never submitted to the jury at all. Secondarily, Putnam argues that, if the counterclaim was submitted, the jury's responses in respect to it were fatally ambiguous. We consider these asseverations in sequence.

### B. *Was the Counterclaim Adjudicated?*

■ The premise supporting Putnam's contention that the district court failed to submit the counterclaim to the jury—a premise that Putnam fails to state, but that the contention must rest upon—is that a claim can only be submitted by an express reference on a verdict form. On this premise, the instructions that the judge gives are little more than window dressing. That is to say, the court's instructions about the implications of a finding for the defendant on the plaintiff's claim, or about the implications of various interrogatory answers for the counterclaim, become meaningless if the court has not provided a separate space on the verdict sheet for the jury to write something like "we find for the defendant on the counterclaim." We do not think this is the law.

■ In the first place, the architecture of Fed.R.Civ.P. 49 itself undercuts Putnam's premise.[4] Whereas Fed.R.Civ.P.

---

4. The rule provides:

(a) **Special Verdicts.** The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

(b) **General Verdict Accompanied by Answer to Interrogatories.** The court may submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict. The court shall give such explanation or instruction as may be necessary to enable the jury both to make answers to the interrogatories and to render a general verdict, and the court shall direct the jury both to make written answers and to render a general verdict. When the general verdict and the answers are harmonious, the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58. When the answers are consistent with each other but one or more is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial.

49(b) contemplates that written interrogatories and a general verdict will be used in tandem, Fed.R.Civ.P. 49(a) allows the court to submit a case for written findings without any general verdict, or to "use such other method of submitting the issues ... as it deems most appropriate," and thereupon to enter such judgment(s) as the findings may dictate. In the second place, it is well established that verdicts must be construed in light of the totality of the surrounding circumstances, including the court's instructions. *See, e.g., Gander v. FMC Corp.*, 892 F.2d 1373, 1378 (8th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 209, 112 L.Ed.2d 169 (1990); *Klein v. Sears Roebuck and Co.*, 773 F.2d 1421, 1427 (4th Cir.1985); *Wright v. Kroeger Corp.*, 422 F.2d 176, 178 (5th Cir.1970); *McVey v. Phillips Petroleum Co.*, 288 F.2d 53, 59 (5th Cir.1961). Thus, Putnam's premise— that a claim can only be submitted to a jury by denomination as such in *haec verba* on the verdict sheet—not only ignores the fact that the Civil Rules themselves provide a vehicle for disposition of cases without any such express reference, but also ignores the importance of the trial court's instructions and the attendant circumstances.

In this case, the surrounding circumstances are dispositive. While the verdict form did not provide a separate question about the counterclaim, the court's instructions mentioned the counterclaim several times and explained in considerable detail how the jury's answers to the special questions would be interpreted in respect to the counterclaim. Moreover, the record shows beyond a shadow of a doubt that Putnam understood and accepted a case concept under which a finding for Pateman on the primary complaint would compel a finding against Putnam on the counterclaim.[5] For us to accept Putnam's hypothesis that the counterclaim was never submitted to the jury, we would have to sever the instruc-

tions from the verdict form, thereby exalting ritual at the expense of substance, and close our eyes to Putnam's knowing acquiescence in the case concept as fashioned by the court below. Courts ought not to play such zero-sum games or allow disappointed suitors to do so. *Cf. Parks v. Turner*, 53 U.S. (12 How.) 39, 46, 13 L.Ed. 883 (1851) (sustaining a verdict which, while technically flawed, was clear enough on its face to convey the intent of the jury); *Roach v. Hulings*, 41 U.S. (16 Pet.) 319, 321, 10 L.Ed. 979 (1842) (refusing to overturn a jury verdict which, while finding for the plaintiff, failed to address explicitly the defendant's affirmative defenses, the Court observing that although "this verdict is not technically responsive to the several pleas, it virtually answers and negatives them all"). The counterclaim was submitted to the jury.

## C. *Were the Responses Ambiguous?*

That the counterclaim was submitted to the jury does not, of course, mean that it was necessarily resolved by the jury in the manner described by the court below. Reduced to bare essence, Putnam's remaining argument is that, in order for a judgment to enter, the jury's verdict must be certain and unambiguous in its import—and that, as to the instant counterclaim, this threshold was never crossed. Though we agree that, in many circumstances, clarity and lack of ambiguity are prerequisites to the entry of judgment upon jury findings, *but cf.* Fed.R.Civ.P. 49(a) (empowering trial judge to make findings on omitted issues of fact), we think that this case passes muster.

■ Here, the record is unclear as to whether the case was given to the jury under Rule 49(a) or 49(b). In colloquy, the district court referred to the verdict form as containing "interrogatories." Although

When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial.
Fed.R.Civ.P. 49.

5. The record is equally plain that a finding against Putnam on the counterclaim would be for the full amount of the advance ($2,000,000), so long as the jury accepted either of Pateman's affirmative defenses. As previously reported, the jury gave complete credence to both of these defenses.

recourse to such terminology is not dispositive, *see Reorganized Church of Jesus Christ of Latter Day Saints v. U.S. Gypsum Co.*, 882 F.2d 335, 338 (8th Cir.1989), the court's language suggests that it had Rule 49(b) in mind. Furthermore, the court analyzed the verdict under Rule 49(b) in deciding certain post-trial motions. These facts, taken together with the jury instructions and the kinds of responses sought by the verdict form, indicate that at least some of the claims were submitted under Rule 49(b). *See, e.g., Portage II v. Bryant Petroleum Corp.*, 899 F.2d 1514, 1520 (6th Cir.1990) (applying similar criteria to determine the kind of verdict sought); *see also Scott v. Isbrandtsen Co.*, 327 F.2d 113, 119 (4th Cir.1964).

But, simply because Rule 49(b) was used to resolve the primary complaint does not necessarily mean that the counterclaim was so governed. To the contrary, having established beyond cavil that the counterclaim was submitted to the jury, *see supra* Part II(B), the fact that there was no space provided on the form for the entry of a general verdict on the counterclaim argues persuasively that the counterclaim should be considered under Rule 49(a). *See Simien v. S.S. Kresge Co.*, 566 F.2d 551, 556 (5th Cir.1978) (where the jury has not been given an appropriate form for a general verdict, "the submission must be judged under the standard of Rule 49(a)"); *see also Scott*, 327 F.2d at 119. Nor is such a hybrid submission prohibited. After all, a district court has wide discretion in constructing and utilizing verdict forms. *See, e.g., Floyd v. Laws*, 929 F.2d 1390, 1395 (9th Cir.1991); *Portage II*, 899 F.2d at 1520; *Reorganized Church*, 882 F.2d at 338; *Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556, 1561 (Fed.Cir.), *cert. denied*, 488 U.S. 850, 109 S.Ct. 132, 102 L.Ed.2d 104 (1988); *Geosearch, Inc. v. Howell Petroleum Corp.*, 819 F.2d 521, 527–28 (5th Cir.1987); *Klein*, 773 F.2d at 1426–27; *Kazan v. Wolinski*, 721 F.2d 911, 915 (3d Cir.1983); *see also* Fed.R.Civ.P. 49(a) (court may use such methods of submitting issues "as it deems most appropriate"). In the exercise of this discretion, district courts may mix and match kinds of

verdicts. *See, e.g., Loffland Bros. Co. v. Roberts*, 386 F.2d 540, 546 (5th Cir.1967) (upholding the use of specific interrogatories concerning one party's claim and general questions concerning another party's claim), *cert. denied*, 389 U.S. 1040, 88 S.Ct. 778, 19 L.Ed.2d 830 (1968); *Clegg v. Hardware Mut. Cas. Co.*, 264 F.2d 152, 156 (5th Cir.1959) (a jury verdict may be "on a general charge or by special questions, or a blend of both under [Fed.R.Civ.P.] 49").

In this case, the district court may have feared that requiring a general verdict on the counterclaim would overcomplicate matters. The case concept accepted by all parties dictated that a finding for Pateman on either or both of its affirmative defenses *a fortiori* compelled a return of the money advanced. Additional questions beyond those needed under the case concept might have served to encumber the real issues and make the jury's task needlessly complex. Whatever the district court's actual reasons, it is at least arguable, perhaps likely, that the court's approach saved the jury time and spared possible confusion in an already labyrinthine case. The court, therefore, did not misuse its broad discretion in employing a hybrid verdict form.

██ To be sure, the crafting of so unorthodox a procedure makes it desirable that a reviewing tribunal afford heightened scrutiny to what ultimately transpired below. We do so here in order to ensure both the fairness of the procedure and the definiteness of the jury's views on the counterclaim. As to the former, there is no room for doubt. Putnam knew about, and acquiesced willingly in, the lower court's approach. It sat silent when it learned of the verdict form's shape and when it heard the instructions under which the court submitted the counterclaim to the jury. Silence after instructions, including instructions on the form of the verdict to be returned by the jury, typically constitutes a waiver of any objections. *See Anderson v. Cryovac, Inc.*, 862 F.2d 910, 918 (1st Cir. 1988) ("If a slip has been made, the parties detrimentally affected must act expeditiously to cure it, not lie in wait and ask for another trial when matters turn out not to

their liking."). The short of it is that a party cannot be permitted to complain about invited errors. Here, Putnam forfeited any right to gripe about a lack of procedural orthodoxy.[6] To hold otherwise "would place a premium on agreeable acquiescence to perceivable error as a weapon of appellate advocacy." *Merchant v. Ruhle*, 740 F.2d 86, 92 (1st Cir.1984).

■ The matter of certainty must also be resolved against Putnam. A jury need not use any particular language in rendering its verdict. "Any words which clearly convey the meaning and intention of the jury are sufficient." *Faudree v. Iron City Sand & Gravel Co.*, 315 F.2d 647, 649–50 (3d Cir.1963). In this instance, especially given the tenor of the charge and the universally accepted case concept, the findings on item four required the entry of a judgment in Pateman's favor on the counterclaim. Unlike the cases cited by Putnam which have found ambiguity in jury verdicts, *see, e.g.*, *Russell v. Place*, 94 U.S. 606, 24 L.Ed. 214 (1876), there is no plausible theory here, legal or equitable, which could ground an assertion that the jury findings were ambiguous. The court charged, without objection, that a finding of intentional nondisclosure would constitute grounds sufficient for Pateman to prevail on the counterclaim. The jury so found. For our part, "[w]e must assume that the jury listened to and understood the court's entire charge." *Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575, 592 (1st Cir.), *cert. denied*, 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979).

What is more, our conclusion that the court, with the parties' acquiescence, submitted the counterclaim under Rule 49(a),

not Rule 49(b), albeit by implication, dispels any lingering questions about ambiguity. In the Rule 49(a) context, a failure to object to omissions in interrogatories constitutes a waiver of jury trial on those issues. *See, e.g.*, *Pielet v. Pielet*, 686 F.2d 1210, 1218 (7th Cir.1982) ("[I]f the trial court 'omits any issue of fact raised by the pleadings or by the evidence' ... each party waives the right to a jury trial of the omitted issue unless he demands its submission before the jury retires.") (quoting Rule 49(a)), *cert. denied*, 459 U.S. 1107, 103 S.Ct. 733, 74 L.Ed.2d 957 (1983); *Cote v. Estate of Butler*, 518 F.2d 157, 160 (2d Cir.1975) (same). This is especially true in the instant case where Putnam waited until after the jury had been polled and dismissed to inform the court about the supposed deficiency in the verdict form, and even then, did not request, as it might have done, that the jury be reconvened. Reassembly was a distinct possibility, *see Summers v. United States*, 11 F.2d 583, 586 (4th Cir.) (it is the settled rule that the jury "may remain undischarged ... though discharge may have been spoken by the court, if ... it remains an undispersed unit, within the control of the court"), *cert. denied*, 271 U.S. 681, 46 S.Ct. 632, 70 L.Ed. 1149 (1926); *see also Brown v. Gunter*, 562 F.2d 122, 124–25 (1st Cir.1977), and Putnam's failure to make such a request can be seen as a second waiver. In situations where litigants had far less notice of a trial court's intention to act in conceivably erroneous ways, we have ruled that an adversely affected party, having failed to take prompt corrective action, must forever hold its tongue. *See, e.g.*, *United States v. DiPietro*, 936 F.2d 6, 11–

---

6. We find instructive *Western Fire Ins. Co. v. Word*, 131 F.2d 541 (5th Cir.1942). There, in a case somewhat analogous to this one, the Fifth Circuit wrote:

> [T]he court fully and fairly charged the jury on every material issue in the case, and gave specific instructions as to the form of verdict to be returned if the jury found for [one side or the other]. When the court concluded instructions to the jury, counsel who is now complaining of the form and of the insufficiency of the verdict, expressed satisfaction with the instructions, and when asked if he had any objections to make stated without

reservation, "None for us, Your Honor." The verdict of the jury complied literally with the form contained in the court's charge, and, accordingly, judgment ... was entered on that verdict. It is a rule of law so old that the memory of man runneth not to the contrary that one may not sit by without objection to rulings or instructions, and then after verdict and judgment, and when it is too late for the court to change its rulings or charge, come forward with objections on appeal and seek to put the court in error.

*Id.* at 543–44.

12 (1st Cir.1991); *Reilly v. United States,* 863 F.2d 149, 160–61 (1st Cir.1988).

■ To recapitulate, we deem the district court to have made a hybrid submission here, submitting the primary complaint and Pateman's complaint against Frenkel to the jury under Rule 49(b), but submitting the counterclaim to the jury under the aegis of Rule 49(a). So viewed, the court, given the parties' acquiescence and the jury's specific findings, properly entered judgment for Pateman on the counterclaim. In this matter, as in *Roach v. Hulings,* should the judgment be arrested on the hypertechnical basis urged by the appellant, "this would be done neither from a necessity to guard the merits of the controversy, nor from the principles of sound inductive reasoning; but solely in obedience to an artificial and technical rule." 41 U.S. at 321. Like the *Roach* Court, we find it both unnecessary and unwise to follow so petrified an approach.

## III. PUTNAM'S OTHER ASSIGNMENTS OF ERROR

Putnam marshals a host of other claimed errors. We treat its sufficiency-of-the-evidence claim *in extenso,* before dealing summarily with the remainder of its arguments.

### A. *Sufficiency of the Evidence.*

■ Putnam assails the evidence as insufficient to sustain the verdict in Pateman's favor on any basis. Principles of judicial restraint counsel, however, that if determination of an issue effectively disposes of an appeal, the appellate court should resolve the case on that basis without reaching other presented issues. *See, e.g., Bob Willow Motors, Inc. v. General Motors Corp.,* 872 F.2d 788, 795–96 (7th Cir.1989); *Wilken v. International Harvester Co.,* 701 F.2d 730, 733 (8th Cir.1983); *Howard v. Gonzales,* 658 F.2d 352, 358 (5th Cir.Unit A 1981). Because our review of the record convinces us that the verdict is fully sustainable on the ground of nondisclosure, we need not consider whether the evidence was also sufficient in respect to agent infidelity and/or nonoccurrence of loss.

The nondisclosure defense arose out of Pateman's allegation that the underwriters were never advised of two episodes occurring before the Lloyd's policy was placed. Pateman asserted that knowledge of these episodes would have altered his decision to cover the risk. Both incidents occurred at customer-controlled sites where, as in its transactions with SI, the dealer stored precious metals. The first vignette involved Putnam's predecessor in interest, Fundamental Resources. In March 1985, Fundamental asked Frenkel to report an alleged conversion of more than $1,000,000 in silver from the premises of a customer, Refinemet International Co. Thereafter, Fundamental took legal action against Refinemet. The insurance claim and the Refinemet suit were still unresolved when the Lloyd's policy was written. At one point, it appeared that Refinemet would redeem the loss. As late as March 1987, however, Putnam asked Frenkel to "reiterate our demand" that the insurer pay the claim. Eventually, Refinemet made good and the insurance claim abated.

The second episode involved a loss at Jackson Precious Metals, reported by Putnam to Frenkel in April 1986. Again, Putnam launched a third-party action, suing Jackson's owner and the field warehouseman, SLT. The dispute was pending when the Lloyd's policy took effect. Later on, SLT and Jackson's owner settled with Putnam; and despite a decision to deny coverage, Putnam's insurer reimbursed Putnam's sue-and-labor expenses incident to the claim.

The record is clear that Pateman was not informed of either episode. At trial, Putnam took the position that, having effected a third-party recovery in each instance, the episodes did not involve losses for which insurance was claimed, and were, therefore, immaterial to an assessment of the risk to be assumed by Pateman. Putnam also asserted that proof of intent to deceive was lacking. It moved, successively, for a directed verdict, judgment n.o.v., and a new

trial. It now urges that the court below erred in failing to grant these motions.

Since this assignment of error challenges the sufficiency and weight of the proof, we pause to restate the principles which govern our review. As to motions for judgment as a matter of law:[7]

> The yardstick by which we take the measure of a refusal to grant a directed verdict is the same as that which we apply to the denial of a judgment n.o.v. In conducting that exercise, we may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence. Rather, we must examine the evidence and the inferences reasonably to be drawn therefrom in the light most favorable to the non-movant.... A judgment notwithstanding the verdict should be granted only when the evidence, viewed from this perspective, is such that reasonable persons could reach but one conclusion.

*Wagenmann v. Adams,* 829 F.2d 196, 200 (1st Cir.1987) (citations omitted). As to motions for new trials, appellate review is also severely circumscribed:

> Denial of a motion for new trial will be reversed only for an abuse of discretion, and the discretion afforded the trial judge is limited from the outset. A trial judge may not grant a motion for a new trial merely because he or she might have reached a conclusion contrary to that of the jurors, rather, the trial judge may set aside a jury's verdict only if he or she believes that the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice.

*Conway v. Electro Switch Corp.,* 825 F.2d 593, 598–99 (1st Cir.1987) (citations omitted). Pateman's case survives scrutiny under these standards by a comfortable margin.

It is black letter law that fraud may be established by inference from circumstan-tial facts. As the Court wrote almost half a century ago:

> [W]hile objective facts may be proved directly, the state of a man's mind must be inferred from the things he says or does.... [C]ourts and juries every day pass upon knowledge, belief and intent—the state of men's minds—having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.

*American Communications Ass'n v. Douds,* 339 U.S. 382, 411, 70 S.Ct. 674, 690, 94 L.Ed. 925 (1950); *see also* F. Harper, F. James, Jr., & O. Gray, *The Law of Torts,* § 7.10, at 451 n. 24 (2d ed. 1986) (proof of fraudulent intent may be established by circumstantial evidence). The state of a person's mind must be inferred primarily from what he says and what he does. In addition, "[s]uch an inference may come from proof of the objective falsity itself, from proof of a motive to lie, and from other facts tending to show that the defendant really knew the things he claimed not to know." *United States v. Sweig,* 441 F.2d 114, 117 (2d Cir.), *cert. denied,* 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971).

■ Here, the deception was adequately proven. The incidents involved matters of likely interest to an insurer poised to propose a coverage package. There was evidence that Frenkel's correspondence and internal memoranda referred to the incidents as "losses" and "claims." There was also evidence from which a factfinder could infer that the deception was both material and studied. The jury heard testimony that Pateman believed the incidents to be critical to a reasoned consideration of the underwriting risk; that both Putnam and Frenkel were aware of the ongoing legal actions referable to these incidents; that the insurer involved would soon cancel its policy; that difficulties were being encountered in securing replacement coverage;

---

**7.** Under recent amendments to Fed.R.Civ.P. 50(b) the difference in nomenclature between a pre-verdict "motion for directed verdict" and a post-verdict "motion for judgment n.o.v." has been abolished. See *Federal Civil Judicial Pro-cedure and Rules* 139 (West Pub. Co. rev. ed. 1991). Both sets of motions are now known as motions for judgment as a matter of law. *See id.* The legal standard governing the grant or denial of such motions remains unchanged.

and that the underwriters might be worried about applicants such as Putnam "from a morality point of view." The jury also heard that Frenkel, acting to Putnam's behoof, was determined to place Putnam in the ocean marine market even though Putnam had no international sendings, did not actually use the foreign sites mentioned in Frenkel's correspondence, and had already experienced an earlier policy cancellation because it was not an authentic ocean marine risk. This, and other, evidence,[8] coupled with the lack of any credible reason for nondisclosure, was enough to allow reasonable factfinders to infer the scienter required to establish concealment with intent to deceive. The law is not so struthious as to require that a jury ignore inferences which it reasonably finds are obvious. *United States v. Ingraham*, 832 F.2d 229, 240 (1st Cir.1987), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988).

■ Putnam has another string to its bow. It contends that, even if intent to deceive can be gleaned from the evidence, causation cannot. This contention depends on the somewhat curious notion that, even if information concerning the Refinemet and Jackson claims had been provided to Minet, the latter might not have relayed the information to Pateman.[9] Indeed, Minet's spokesman refused to say during the trial whether he would have told Pateman

of Putnam's prior claims had he been apprised of them. So, Putnam's thesis runs, failure to disclose could not have been a legal cause of Pateman's injury. We disagree.

■ "Application of the legal cause standard to the circumstances of a particular case is a function ordinarily performed by, and peculiarly within the competence of, the factfinder." *Swift v. United States*, 866 F.2d 507, 510 (1st Cir.1989); *see also Peckham v. Continental Cas. Ins. Co.*, 895 F.2d 830, 837 (1st Cir.1990) (questions of causation "are normally grist for the jury's mill"); *Marshall v. Perez Arzuaga*, 828 F.2d 845, 850–51 & n. 8 (1st Cir. 1987) (similar), *cert. denied*, 484 U.S. 1065, 108 S.Ct. 1027, 98 L.Ed.2d 991 (1988); *Springer v. Seaman*, 821 F.2d 871, 876 (1st Cir.1987) (similar); W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser & Keeton on the Law of Torts* 321 (5th ed. 1984) ("[I]t may properly be said that 'proximate cause is ordinarily a question of fact for the jury, to be solved by the exercise of good common sense in the consideration of the evidence of each particular case.'") (citation and footnotes omitted). When, as here, the existence of proximate cause turns on an issue of superseding causation (the likely conduct of Minet), the jury's role may be especially significant. *See, e.g., Prince v. Leesona Corp.*, 720 F.2d 1166, 1169 (10th Cir.1983).

8. We think it significant, too, that the jury saw documents in which Frenkel attested to Putnam's status as a "concerned, careful and conservative organization." While statements of opinion, especially trade talk and puffing, are generally not adequate predicates for a finding of fraud unless the statements suggest that a significant amount of factual information underlies the opinion, *see* Harper, James & Gray, *supra*, § 7.8, at 430–31, we cite the testimony regarding Putnam's care as evidence which could help a jury to conclude that Frenkel regarded Putnam's background to be material to an underwriting assessment of the firm's insurability.

9. Minet's status was disputed at trial and in the parties' appellate briefs. Minet seemed to view itself as an agent for Frenkel. Along the same line, Pateman argues that Minet was Frenkel's agent, and therefore, Putnam's sub-agent. Putnam contends, however, that Minet was an inde-

pendent contractor. We need not answer the question in a definitive way. Were Minet Frenkel's agent, it would, under prevailing principles of agency, have been Putnam's sub-agent. *See* Restatement (Second) of Agency § 79(b) & (c) (1958). As such, any failure by Minet to disclose would be chargeable to Putnam so long as Minet, as here, was acting within the scope of its employment. *See* Harper, James & Gray, *supra*, § 26.9, at 50. If Minet were Pateman's agent, Putnam would likewise be debarred from pursuing an intervening cause argument premised on the possibility that Minet might betray Pateman. *Cf.* Restatement (Second) of Torts § 531 (1977) (stating liability principles governing fraudulent misrepresentations which damage individuals or classes intended or expected to be influenced by the misrepresentations). Accordingly, we indulge the only scenario that offers Putnam a ray of hope, and assume, *arguendo*, that Putnam's view is correct: Minet acted as an independent contractor.

Our analysis of superseding cause is guided by several principles. First, foreseeability often affects whether an intervening act relieves an actor from liability for his antecedent wrongdoing. Foreseeability is usually a jury question. *See Springer*, 821 F.2d at 877; *see also* Restatement (Second) of Torts, § 453 comment b (1965) (stating that the question should be left to the jury whenever "there is room for reasonable difference of opinion"). Second, the difficulties which inevitably arise when proof of causation hinges upon counterfactual reasoning emphasize the importance of inferences and common sense in the factfinding process. As one text states:

> The fact of causation is incapable of mathematical proof, since no one can say with absolute certainty what would have occurred if the defendant had acted otherwise....
>
> Circumstantial evidence, expert testimony, or common knowledge may provide a basis from which the causal sequence may be inferred.

*Prosser & Keeton, supra*, at 269–70 (footnotes omitted). Third, when the evidence is in conflict, the determination of what the intervening actor actually did is almost always for the jury. *See* Restatement (Second) of Torts, § 453, comment c. These convergent principles argue persuasively that, in cases where superseding cause is raised as a defense and there is some basis for disagreement as to the facts, the jury should ordinarily resolve the question of what a third party would likely have done had the defendant refrained from committing the original wrong. If the rule were otherwise, every similarly situated suitor would be left in an epistemological quandary, required, in effect, to do the impossible, that is, to prove a negative by direct evidence.

Against this backdrop, we think that causation was adequately proved. There was evidence that Putnam, through Frenkel, sought to anticipate the inquiries of the underwriters in its provision of information to Minet; that Frenkel assumed the information would be used in negotiating for coverage; that Minet viewed the situation as one requiring all parties to negotiate in utmost good faith; and that Minet's man took all the correspondence and documentation supplied by Frenkel to his meeting with Pateman. From this evidence, a jury could reasonably infer that Minet would have forthrightly disclosed any meaningful information provided to it regarding prior claims.[10]

### B. *The Intent Requirement.*

■ The district court erred, Putnam says, in charging that, so long as the failure to disclose material matters was intentional, then Pateman could prevail on the nondisclosure defense and counterclaim. In Putnam's view, rather than merely finding an intentional failure to disclose, the jury should have been required to find that disclosure was omitted by reason of an actual intent to deceive. Put another way, Putnam asserts that the court failed to make it clear that, for Pateman to prevail, the evidence had to establish that Frenkel not only kept matters in the bosom of the lodge, but did so with the purpose of deceiving the underwriters. Assuming for argument's sake that intent to deceive was a necessary element of the case, we find Putnam's self-serving characterization of the instructions to be unwarranted: taken in its totality, the court's charge adequately conveyed an intent requirement.

The district court charged in so many words that Pateman, to prevail on the affirmative defense of intentional failure to disclose and on the counterclaim, had to prove that Putnam, directly or through its agent, "withheld or failed to disclose fully ... material facts with intent to deceive Defendant Pateman." Record Appendix (R.A.) 2471a. In light of this explicit in-

---

**10.** In view of this conclusion, we need not reach, and express no opinion on, Pateman's argument, citing *Fogel v. Chestnutt*, 668 F.2d 100 (2d Cir.1981), *cert. denied*, 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982), that in cases of this stripe the deceitful misrepresentation is itself sufficient to establish the requisite causation (wholly aside from what the intermediary party might or might not have done).

struction, Putnam's assignment of error seems rather puzzling. Having studied Putnam's briefs, the gravamen of its complaint can only be that the district court should have married the phrase "to deceive" to the word "intent" each time the latter word was uttered. But, a litigant "has no right to put words in a judge's mouth." *United States v. McGill (Robert)*, 953 F.2d 10, 12 (1st Cir.1992). So long as the charge, viewed as a whole, adequately limns the controlling issues, and does so without confusing or misdirecting the jury, the trial judge enjoys considerable discretion in the choice of idiom. He or she need not parrot the exact language that a litigant prefers. *See, e.g., id.; Brown v. Trustees of Boston University*, 891 F.2d 337, 354 (1st Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990); *United States v. Nivica*, 887 F.2d 1110, 1124 (1st Cir.1989), *cert. denied*, 494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990); *Brown v. Freedman Baking Co.*, 810 F.2d 6, 9–10 (1st Cir.1987).

Reading the trial court's instructions in their entirety, we are constrained to dismiss Putnam's jeremiad as comprising more cry than wool. The instructions made clear, on more than one occasion, that the intent at issue was an intent to deceive. That the district court did not chant the talisman "to deceive" every time the word "intent" or some varietal thereof was mentioned neither invalidated nor undermined the instructions. *See Veranda Beach Club Ltd. Partnership v. Western Surety Co.*, 936 F.2d 1364, 1384 (1st Cir.1991) ("[T]he presider is not obligated to tailor the instructions to suit a party's preference or fit the idosyncratic facts of the particular case."); *United States v. Cintolo*, 818 F.2d 980, 1004 (1st Cir.) ("Because the district court's charge adequately covered the subject matter of what the defendant suggested ... no error can successfully be assigned to the 'trial court's failure to use the precise language that defendant ... would have preferred.' ") (citation omitted), *cert.*

*denied,* 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987).

It would serve no useful purpose to linger. Even if the instructions on intent to deceive could have been somewhat more precise in linking intent to deception, we do not think it possible that, in light of the charge as a whole, so subtle a nuance loosened the jury's grasp of the governing law or improperly influenced its deliberations.

### C. *Failure to Return Premiums.*

■■■■ Invoking Fed.R.App.P. 28(i) in a cryptic single-sentence footnote in its appellate brief,[11] Putnam seeks to "adopt Frenkel's discussion with respect to [Pateman's] failure to return the insurance premiums." A number of obstacles block the path of this initiative. We mention two of them.

While Frenkel argued below that the underwriters wrongly refused to return premiums, it discarded the argument on appeal. We have had several occasions recently to remind counsel that there are limits to the ability of parties to adopt other parties' arguments by reference. *See, e.g., United States v. Isabel*, 945 F.2d 1193, 1200 (1st Cir.1991); *United States v. David*, 940 F.2d 722, 737 (1st Cir.), *petition for cert. denied*, — U.S. —, 112 S.Ct. 908, 116 L.Ed.2d 809 (1991). One obvious limit to an appellant's power to hitch its wagon to another appellant's star is that the adopter cannot adopt an argument that the adoptee has not advanced on appeal. Because Frenkel made no argument on appeal concerning the effect of the underwriters' failure to refund premiums, Putnam cannot legitimately peddle such wares through the medium of Rule 28(i).

The second obstacle in Putnam's path is equally insurmountable. Frenkel does make a related argument, trying to convince us that Pateman's continued *collection* of premiums after deciding to deny coverage was tantamount to a waiver of all rights of rescission. But, Putnam's at-

---

11. Fed.R.App.P. 28(i) provides in relevant part:
   In cases involving more than one appellant or appellee, including cases consolidated for pur-

poses of the appeal, ... any appellant or appellee may adopt by reference any part of the brief of another.

tempted adoption of this asseveration is in the nature of an epiphany, Putnam not having advanced the asseveration before the district court.[12] Nothing in Rule 28(i) displaces the requirement that, in order to raise a particular point on appeal, an appellant must first have raised the point below. *See, e.g., Clauson v. Smith*, 823 F.2d 660, 666 (1st Cir.1987).

For the reasons stated, we reject Putnam's appeal in all its ramifications.[13]

## IV. FRENKEL'S APPEAL

Pateman's hodgepodge complaint against Frenkel originally asserted a bevy of legal theories. Some were abandoned along the way. At trial, the district court directed a verdict for Frenkel on Pateman's negligence claims, including the claim of negligent misrepresentation.[14] When the dust settled, Pateman's suit against Frenkel went to the jury solely on a tort claim charging intentional nondisclosure. The jury awarded Pateman $2,000,000. Before us, Frenkel clusters its heaviest artillery in support of its contentions that (1) the evidence was too exiguous to take the tort claim to the jury; and (2) in the alternative, the jury was improperly instructed on the quantum of proof necessary to sustain the claim. We believe that our previous analysis fully disposes of the first of these challenges.[15] We limit the ensuing commentary, therefore, to Frenkel's alternative contention.

### A. The Problem.

The stage is easily set. Over Frenkel's objection, the district court told the jury to use a preponderance of the evidence standard in determining whether Frenkel was guilty of intentional nondisclosure. Frenkel urges that, as between Frenkel and Pateman, the tort had to be proven by clear and convincing evidence.

The problem has two aspects. The first aspect centers around choice of law. Although the district court seems never to have made an unequivocal choice as to which state's law governed this issue,[16]

12. Frenkel, on the other hand, did file a post-trial motion advancing the collection-of-premiums argument—a motion in which Putnam did not join. While Frenkel's appeal turns on another question, eliminating any necessity for dealing with its motion at length, we note, as an aside, that the district court's denial of the motion was well within its discretion. *See* Fed. R.Civ.P. 60(b)(2) (court may relieve a party from a final judgment based on new evidence only if the evidence "by due diligence could not have been discovered" in time for use at trial or under Rule 59); *see also Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.*, 833 F.2d 208, 212 (9th Cir.1987) (if evidence is in a party's possession before the judgment against it is rendered, the evidence, by definition, cannot be classified as "newly discovered" for purposes of Rule 60(b)(2)); *Taylor v. Texgas Corp.*, 831 F.2d 255, 259 (11th Cir.1987) (similar).

13. Putnam briefed and argued several other points. Most of them involved evidentiary issues relating to whether a loss occurred within the policy period. As between Putnam and Pateman, however, the jury verdict is sustainable on an independently sufficient ground: intentional nondisclosure of material facts. Thus, we may leave the evidentiary issues to one side, noting only that any irregularity therein could not have tainted the jury's findings on nondisclosure or damages. To the extent that Putnam alludes to other supposed errors, not encompassed within the preceding generality, discus-

sion would serve no useful purpose. Without exception, each such bevue suffers from one or more of the following infirmities: (1) it was not properly preserved at trial, (2) it lacks developed argumentation on appeal, (3) it is subsumed by our discussion of other points, (4) it is an irrelevancy, given our *ratio decidendi*, and/or (5) it is patently unmeritorious.

14. Pateman has not appealed this ruling.

15. Insofar as matters material to the risk were concerned, Frenkel knew virtually everything that Putnam knew. It oversaw, through Minet, the dealings with Pateman that led to issuance of the Lloyd's policy. Hence, Frenkel's argument that the evidence was insufficient to sustain a verdict against it fails for essentially the same reasons that Putnam's parallel argument failed. *See supra* Part III(A). We add only that the evidence was sufficient for a jury to find fraudulent concealment either under the preponderance standard accepted by Putnam or under the more rigorous "clear and convincing" standard that Frenkel contends should have been applied in Pateman's suit against it.

16. During the trial proper, the district judge eschewed any formal choice of law. The judge appears to have concluded that there were no significant differences between New York and Rhode Island law on the key issues. Then, in a post-trial rescript dealing with prejudgment in-

Pateman intimates that the court looked to the substantive law of Rhode Island, *see, e.g., Ostalkiewicz v. Guardian Alarm,* 520 A.2d 563, 569 (R.I.1987), in deciding that the preponderance standard applied. Frenkel contends this was error. It asserts that the court should have derived the quantum of proof from New York law. Frenkel says this error makes a decisive difference: it reads the caselaw, *e.g., Leucadia, Inc. v. Reliance Ins. Co.,* 864 F.2d 964, 971 (2d Cir.1988), *cert. denied,* 490 U.S. 1107, 109 S.Ct. 3160, 104 L.Ed.2d 1023 (1989), as requiring, in New York, that intent to deceive be proved by clear and convincing evidence. And, the jury in this case was not so instructed.

Pateman's rejoinder frames a second aspect of the problem. He asserts that, under the New York cases, if the insurer makes inquiries and the insured conceals material facts, proof of deceit is altogether unnecessary. Thus, it is Pateman's position that, even if New York law supplied the appropriate rule of decision, the district court properly abjured an instruction that intent to deceive had to be proven by clear and convincing evidence.

Having stated the problem, we next shine the light of our understanding on the conflict as to which jurisdiction's substantive law should be embraced. We then attempt to chart the contours of that law.

## B. What State's Law Governs?

1. *The Methodology.* In diversity cases, the federal courts look to the choice-of-law rules of the forum state, here, Rhode Island. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Borden v. Paul Revere Life Ins. Co.,* 935 F.2d 370, 375 (1st Cir.1991). In tort cases Rhode Island uses an interest-weighing approach to choice-of-law issues.[17] *See Pardey v. Boulevard Billiard Club,* 518 A.2d 1349, 1351 (R.I.1986); *Brown v. Church of the Holy Name,* 105 R.I. 322, 252 A.2d 176, 178 (1969); *Woodward v. Stewart,* 104 R.I. 290, 243 A.2d 917, 923, *cert. dismissed,* 393 U.S. 957, 89 S.Ct. 387, 21 L.Ed.2d 371 (1968). The factors to be balanced include (a) the place of injury; (b) the place where the conduct causing the injury occurred; (c) the place that the parties call home (e.g., their domicile, residence, nationality, place of incorporation, place of business and the like); and (d) the place where the relationship between the parties was centered. *See, e.g., Brown,* 252 A.2d at 179. When this basic list of factors proves inconclusive, an inquiring court should make a selection from amongst the available candidates with an eye on such prudential principles as predictability of results, maintenance of interstate and international order, simplification of the judicial task, advancement of

---

terest, the judge stepped to the brink of a decision. He wrote:

> Defendant Frenkel contends that this Court applied New York law at trial and thus New York's interest statute should apply. At no time during the course of this trial did this Court decide that New York law was the law it would apply. This Court determined that Rhode Island had the most significant contacts with the litigation, not New York.

Four months later, during oral argument on another group of post-trial motions, the judge backtracked, stating that he had made "a conscious effort not to make [a choice-of-law] determination." R.A. 3182a–83a.

**17.** Generally, the law of the forum governs procedural matters. *See* Restatement (Second) Conflict of Laws, §§ 133–35 (1971); *see also Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 778 n. 10, 104 S.Ct. 1473, 1480 n. 10, 79 L.Ed.2d 790 (1984) ("Under traditional choice-of-law principles, the law of the forum State governs

on matters of procedure."). It is problematic whether the question here—what law should govern the quantum of proof for establishing fraud?—is properly categorized as one of procedure or of substance. *See* 1 Wigmore, *Evidence* § 5 at 358 n. 11 (Tillers rev. 1983) ("Burdens of proof, sufficiency of evidence ... and presumptions are sometimes treated as substantive and sometimes as procedural, with burdens of proof and those evidentiary rules thought to affect burdens of proof being most often treated as substantive."). We need not probe the point too deeply, however, for two reasons. First, Rhode Island's choice-of-law rules, labels aside, seem to favor resort to the interest-weighing test even for issues that do not directly involve standards of conduct. *See Montaup Elec. Co. v. Ohio Brass Corp.,* 561 F.Supp. 740, 744 (D.R.I.1983); *Brown v. Church of the Holy Name,* 105 R.I. 322, 252 A.2d 176, 181 n. 10 (1969). Second, Pateman has not argued that the quantum of proof issue should be treated as procedural for choice-of-law purposes.

the forum's governmental interests, and application of the better rule of law. *See Woodward,* 243 A.2d at 923; *see also* Restatement (Second) Conflict of Laws § 6 (1971).

■ In applying Rhode Island's choice-of-law rules to the case at hand, it is important to understand the principle of depecage. In legal parlance, depecage erects the framework under which different issues in a single case, arising out of a common nucleus of operative facts, may be decided according to the substantive law of different states. *See Hutner v. Greene,* 734 F.2d 896, 901 (2d Cir.1984); *Broome v. Antlers' Hunting Club,* 595 F.2d 921, 923 n. 5 (3d Cir.1979); E. Scoles & P. Hay, *Conflict of Laws* 40, 75 (1984); R. Leflar, *American Conflicts Law* 221 (3d ed. 1977). Although the Rhode Island Supreme Court has yet to pledge express allegiance to the principle of depecage, the court's decisions make it clear that Rhode Island, like most other jurisdictions, adheres to the principle in the tort context. In *Woodward,* for example, the court held that Massachusetts law governed some issues, while Rhode Island law governed others. *See Woodward,* 243 A.2d at 923–24. To like effect, in *Busby v. Perini Corp.,* 110 R.I. 49, 290 A.2d 210 (1972), the court stated that it intended to "pass on the rights and liabilities of the parties with respect to *an issue* in tort in accordance with the local law of the state which, *with respect to that issue,* had the most significant relationship to the occurrence and the parties." *Id.* 290 A.2d at 212 (emphasis supplied). Moreover, the very section of the Restatement which the state supreme court chose to follow in *Busby* endorses the use of depecage in resolving conflicts in tort cases. *See* Restatement (Second) Conflict of Laws § 145; *see also id.,* comment on subsection (1)(d) ("Each issue is to receive separate consideration if it is one which would be resolved differently under the local law rule of two or more of the potentially interested states.").

Therefore, as a matter of methodology, we must apply Rhode Island's interest-weighing approach to the specific issue raised by Frenkel on appeal.

2. *Scope of Application.* Frenkel's ground of appeal does not affect Putnam's appeal for at least four reasons.

■ i. The law is clear that consolidated suits retain their separate identities in a federal court. *See General Contracting & Trading Co. v. Interpole, Inc.,* 940 F.2d 20, 24 (1st Cir.1991) (listing other precedents). Thus, even though the two underlying cases (Putnam v. Pateman; Pateman v. Frenkel) were tried together, they evoked different choice-of-law rules. Since Putnam's suit was initiated in Connecticut and transferred to Rhode Island, Connecticut's choice-of-law rules, rather than Rhode Island's, applied therein. *See Ferens v. John Deere Co.,* 494 U.S. 516, 523, 110 S.Ct. 1274, 1280, 108 L.Ed.2d 443 (1990) (transferee court must "apply the law of the transferor court, regardless of who initiates the transfer").

ii. The issues, though superficially similar, were actually different. As between Putnam and Pateman, the parties' claims were *ex contractu,* pitting an insured against its insurer, and vice versa. As between Pateman and Frenkel, the cause of action was *ex delicto,* pitting an insurer against a putative tortfeasor (the insured's broker). Moreover, a jury could conceivably find that the relevant knowledge possessed by Putnam and Frenkel, respectively, merited different rankings on a fact/opinion continuum. These distinctions are significant for choice-of-law purposes, *compare, e.g., A.C. Beals Co. v. Rhode Island Hospital,* 110 R.I. 275, 292 A.2d 865, 871 (1972) (outlining Rhode Island's choice-of-law rules for contract cases) *with, e.g., Brown,* 252 A.2d at 178 (outlining Rhode Island's choice-of-law rules for tort cases), for purposes of applying the principle of depecage, and for purposes of determining which component of the chosen state's substantive law should govern, *see infra* Part IV(C).

iii. Putnam conceded below that a preponderance standard should be used. Indeed, its trial counsel cursorily dismissed New York as a choice-of-law candidate, de-

scribing that state as "just a pismire" in respect to the genesis of the litigation. R.A. 2524a. A party is, of course, "bound by a plausible choice of law which it successfully urged the trial court to follow." *Borden,* 935 F.2d at 375.

iv. Putnam never argued on appeal for a clear and convincing standard, thereby forfeiting the contest. *See Ryan v. Royal Ins. Co.,* 916 F.2d 731, 734 (1st Cir.1990) (points neither briefed nor argued are waived); *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.) (same), *cert. denied,* 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990).

For these reasons, then, the discussion that follows pertains solely to the choice of law that should have been made, and the substantive rule of law that should have been applied, with respect to Pateman's nondisclosure claim against Frenkel.

■ 3. *Standard of Review.* The court of appeals affords plenary review to a trial court's choice-of-law determinations. *See* 1 S. Childress & M. Davis, *Standards of Review* § 4.13 (1986); *see, e.g., Quintero v. Klaveness Ship Lines,* 914 F.2d 717, 722 n. 3 (5th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1322, 113 L.Ed.2d 255 (1991); *Kukias v. Chandris Lines, Inc.,* 839 F.2d 860, 861 (1st Cir.1988). In this instance, we assume, as the parties suggest, that the court below chose to apply Rhode Island jurisprudence—although, as we previously remarked, *see supra* note 16, it is problematic whether the court actually made a state-specific choice of law on the issue in question.[18]

4. *Implementing the Methodology.* Prospecting in the record for the nuggets of information valued by the forum's law is tedious work. As between Pateman and Frenkel, the place of injury was London; that is where Frenkel's misrepresentations were passed on by Minet, where the policy was authorized, where Putnam's claim was lodged, and where the advance payment originated.[19] The conduct giving rise to the particular injury of which Pateman complained in the suit against Frenkel occurred principally in New York. Frenkel's solicitation for insurance, its representations concerning Putnam, and the form on which the insurance was written all emanated from New York. The parties' places of business were (and are) in London (Pateman) and New York (Frenkel), respectively. The communications that trailed in the wake of the claim, when Pateman sought an explanation for Frenkel's withholding of information anent the insured's prior loss history, were mainly between London and New York. The policy itself specified that New York's statute of limitations would be employed to resolve claims. The policy also contemplated Putnam's continued use of Frenkel, a New York based concern, as its agent for all communications and transactions with the underwriters.

Whereas New York's connection with the Pateman/Frenkel dispute is less than pervasive, it is sturdier than Rhode Island's

---

18. At the very least, the district court was leaning in the direction of the forum. On several occasions the court stated that the Rhode Island judiciary had historically taken an expansive view of when Rhode Island's substantive law would apply. *See, e.g.,* R.A. 2502a (at which point the judge ruminated that, under Rhode Island's conflicts rule, if a case "has anything to do with the State of Rhode Island, Rhode Island law applies"). Moreover, the district court was obviously skeptical of New York's connection to the case as a whole. *See, e.g.,* R.A. 2499a ("As far as I can see, the only real significance and contact in this case with New York is that the lawyers are from New York.").

19. None of the parties suggested the use of English law or gave notice under Fed.R.Civ.P. 44.1 (providing that parties must give notice of intent to "raise an issue concerning the law of a for-

eign country") to that end. Hence, we do not consider the applicability of English law here. *See Clarkson Co. v. Shaheen,* 660 F.2d 506, 512 n. 4 (2d Cir.1981) (where neither party asserted applicability of foreign law, application of New York law was not error), *cert. denied,* 455 U.S. 990, 102 S.Ct. 1614, 71 L.Ed.2d 850 (1982); *Commercial Ins. Co. v. Pacific–Peru Constr. Corp.,* 558 F.2d 948, 952 (9th Cir.1977) (since neither party gave notice of intent to raise issue concerning foreign law, federal court was not under any obligation to apply it); *see also Ruff v. St. Paul Mercury Ins. Co.,* 393 F.2d 500, 502 (2d Cir.1968) (per curiam) (court of appeals could not take judicial notice of foreign law where plaintiff failed to give written notice to district court that he intended to rely upon foreign law).

connection. Other than serving as the forum, Rhode Island had only two fragile links to the dispute: it was the place where the supposed theft occurred and where an insured site was situated. As to the first link, the place of the particular injury complained of in Pateman's suit against Frenkel was London, not Rhode Island. As to the second link, while it is true that, during negotiations for the policy, coverage was obtained for a site in Cranston, Rhode Island, that location was more incidental than integral to the risk; as issued, the insurance policy covered multiple sites in each of five states (including three locations in New York), single sites in three other states (including the Cranston facility), and sites in three foreign countries (including one in England). Thus, Rhode Island's grip on the Pateman/Frenkel dispute was very weak.

■ To the extent that uncertainty might remain as to whether Rhode Island's evanescent contacts with the dispute were enough to warrant bypassing New York's standard of proof, the secondary guidelines limned in *Woodward*, 243 A.2d at 923, erase any lingering doubt. The application of New York law would be far more predictable to the parties than would application of the law of whatever state hosted the suit or had the closest connection with the stolen metal. Interstate order, while not strongly implicated one way or the other here, would best be maintained by applying New York law inasmuch as the defendant is a New York firm, neither party maintains a place of business in Rhode Island, some policy provisions specifically refer to New York law, and "the negotiations for coverage pirouetted around New York." *Albany Ins. Co. v. Wisniewski,* 579 F.Supp. 1004, 1013 (D.R.I.1984).[20] We believe it self-evident that New York possesses a much stronger interest than

Rhode Island in the question of how a New York broker negotiates insurance for a Connecticut partnership in the London market. The remaining *Woodward* guidelines are neutral: it is a standoff as to the "better" rule of law; it would be a mug's game to argue that using either standard would unduly complicate the judicial task; and Rhode Island's interests would not be advanced in any discernible way by applying its substantive law, rather than New York's, to Pateman's claim against Frenkel.

We are also constrained to remark that Pateman, arguing here for the application of Rhode Island's substantive rule, does so with the institutional equivalent of a forked tongue. In the lower court, Pateman laced his submissions with citations to New York caselaw. On several issues, many of which are now academic, Pateman insisted that New York was the place most solidly linked to the claims asserted. *See, e.g.,* R.A. 2497a (Pateman's counsel states that "the contract and the contacts both involve [New York] law"); R.A. 2500a (arguing that, on the issue of bad faith, the district court "should apply the law of New York, because that's where the conduct which is complained of occurred"). Although Pateman did not make this precise contention regarding the deceit claim (he appears to have taken no choice-of-law position on that claim, leaving Putnam and Frenkel to duke it out in the district court on the arguably related contract-law issue of intentional nondisclosure), the fact that he used New York law and lobbied vigorously for its application on other issues, some less directly connected to New York than the issue of deceit *vel non,* comprises a fissilingual factor bearing to some degree upon our determination in this case.[21]

---

**20.** Frenkel relies heavily on *Wisniewski* in support of the proposition that New York law applies. *Wisniewski,* however, involved a contract dispute, not a cause of action sounding in tort. *See Wisniewski,* 579 F.Supp. at 1014. Inasmuch as Rhode Island has developed a rather elaborate analytical apparatus for dealing with tort choice-of-law issues, we think *Wisniewski,* while relevant, has limited applicability.

**21.** We do not mean to imply that Pateman's lawyer was a cat amongst pigeons. The able district judge, confronted with a complicated maze of a case, received little help, and some hindrance, from trial counsel on all sides.

We have said enough. On this scumbled record, as between the two potentially interested states, we think that New York had the more significant relationship to the Pateman/Frenkel dispute and to the affected parties. In the absence of any substantial, legitimate interest justifying the application of Rhode Island's substantive law to this claim, we are of the opinion that a Rhode Island court, mulling the *Brown* and *Woodward* criteria, would handle the quantum of proof issue by resort to New York law. It follows, therefore, that the district court should have done the same.

### C. What Does New York Law Provide?

■ We move next to the question of what New York law actually provides. We start this section of our analysis from the premise that, in general, under New York law, a cause of action in tort, predicated on an intentional, material misrepresentation, known by the defendant to be false when made and relied on by the plaintiff to his detriment, is akin to a claim of intentional fraud, *Simcuski v. Saeli,* 44 N.Y.2d 442, 406 N.Y.S.2d 259, 264, 377 N.E.2d 713, 718 (1978), wherein the tort must be proved by clear and convincing evidence. *See id.; see also Leucadia,* 864 F.2d at 971; *Ajax Hardware Mfg. Corp. v. Industrial Plants Corp.,* 569 F.2d 181, 186 (2d Cir.1977); *Van Alen v. Dominick & Dominick, Inc.,* 441 F.Supp. 389, 402–03 (S.D.N.Y.1976), *aff'd,* 560 F.2d 547 (2d Cir.1977); *Rudman v. Cowles Communications, Inc.,* 30 N.Y.2d 1, 330 N.Y.S.2d 33, 37, 280 N.E.2d 867, 871 (1972); *Jo Ann Homes at Bellmore, Inc. v. Dworetz,* 25 N.Y.2d 112, 302 N.Y.S.2d 799, 803, 250 N.E.2d 214, 218 (1969); *Wayne County Vinegar & Cider Corp. v. Schorr's Famous Pickled Prods., Inc.,* 118 Misc.2d 52, 460 N.Y.S.2d 209, 217 & nn. 22–23 (N.Y.Civ.Ct.1983); 60 N.Y.Jur.2d, Fraud and Deceit § 236, at 799. Pateman does not seriously dispute any part of this generality.[22] Rather, he contends that, although the verdict below was returned on a theory that Frenkel defrauded the underwriters by intentionally failing to disclose material facts to them, proof of deceit was superfluous. Ergo, he concludes that any error in the court's charge was an irrelevancy.

Pateman comes at this conclusion from two slightly different directions, deriving both approaches from the special nature of marine insurance. First, citing *Stecker v. American Home Fire Assur. Co.,* 299 N.Y. 1, 84 N.E.2d 797, 800 (1949), he urges that there was never any need to prove deceit in this sort of case—concealment of material facts in the face of a focused inquiry was enough to warrant the imposition of tort liability. Second, citing cases such as *Wisniewski,* 579 F.Supp. at 1014, he asserts that, under marine insurance principles, the parties to an insurance contract must negotiate *uberrima fides* (sometimes called *uberrimae fidei*), a standard which absolutely requires disclosure of material information in negotiating for coverage, regardless of intent.

We can blunt the force of these contentions without resolving whether, under a policy of marine insurance, ocean marine principles apply equally to "wet" and "dry" risks.[23] Assuming, *arguendo,* that such

---

**22.** A few New York cases have questioned the need for clear and convincing evidence in this context. *See, e.g., Young v. Hutchinson,* 14 A.D.2d 562, 218 N.Y.S.2d 113, 114 (1961) (per curiam) (theorizing that rigorous statements of the fraud/deceit quantum of proof are merely "expressions of opinion as to 'what constitutes a preponderance of evidence'") (citation omitted). The majority view, however, is firmly supportive of the principle. *See Stephenson v. Lord,* 72 A.D.2d 857, 421 N.Y.S.2d 730, 731 (1979) (per curiam) (acknowledging "previous[ ] ... conflict as to the standard of proof applicable in a fraud action," citing *Young,* and concluding nevertheless that the New York courts have since resolved the conflict in favor of a rule requiring clear and convincing proof). In any

event, Pateman has not challenged the correctness of the general principle, instead styling it as "academic."

**23.** The court below ruled that, although the Lloyd's policy was written on a marine form, the risk at issue was "a non-marine risk." R.A. 2314a. Citing *Stecker,* 84 N.E.2d at 799, and *Blair v. National Security Ins. Co.,* 126 F.2d 955 (3d Cir.1942), Frenkel asserts that ordinary marine rules would, therefore, not be in vogue, since the risk itself was other than maritime, that is, the risk did not involve vessels or perils of the sea. Pateman disagrees. We leave the disagreement unattended.

principles can sometimes apply to "dry" risks, they do not apply here. To begin with, *uberrima fides* cannot carry the day because the district court, although solicited by Pateman, did not charge the jury on this theory. We do not think that a verdict returned under an erroneous theory of liability can be left intact on a different, uncharged theory unless the jury's factfinding necessarily embodied each of the elements required to support a verdict under the uncharged theory. *Cf., e.g., Chiarella v. United States*, 445 U.S. 222, 236, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980) (rejecting alternative theory proffered by government to support criminal conviction in light of fact that alternative theory had not been submitted to the jury). Such cases, we suspect, will be few and far between. This is not one of them.

Beyond that observation, we think Pateman's dual approaches to the irrelevancy of the lower court's error share common flaws. First and foremost, the approaches are allogamous: the two lines of authority to which Pateman clings are contract-oriented, not tort-oriented. It is undeniable that *Stecker*—a case much debated, upon which both sides rely, and enigmatic in the bargain—arose out of an insured's suit to recover on the policy. *See Stecker*, 84 N.E.2d at 798. By the same token, *uberrima fides* is by its terms a doctrine that requires a prospective insured, when seeking marine coverage, to disclose all known circumstances materially affecting the risk. *See Ingersoll Milling Machine Co. v. M/V Bodena*, 829 F.2d 293 (2d Cir.1987), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988); *Wisniewski*, 579 F.Supp. at 1014; *see also* 9 Couch, *Couch on Insurance 2d* § 38.76 (1985) ("Good faith and the requirements of the contract of [marine] insurance obligate the insured to make a specific and full disclosure of all material facts of which he has, or ought to have knowledge ... to the insurer."); 2 J. Arnould, *Law of Marine Insurance and Average* (10 *British Shipping Laws*) § 550 (1961) (in marine insurance, the *uberrima fides* doctrine provides that "non-disclosure or misrepresentation by the assured ... will give [the underwriter] the right to avoid the policy"). For almost two centuries, it has been thought that the contractual relationship animates the duty. *See, e.g., McLanahan v. Universal Ins. Co.*, 26 U.S. (1 Pet.) 170, 185, 7 L.Ed. 98 (1828) ("The contract of [marine] insurance has been said to be a contract *uberrimae fidei* ...."). Hence, under the doctrine's operation, "the parties to a marine insurance policy must accord each other the highest degree of good faith." *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *accord Puritan Ins. Co. v. Eagle S.S. Co.*, 779 F.2d 866, 870 (2d Cir.1985). *Uberrima fides* characterizes the relationship of the contracting parties *inter sese*. It does not concern strangers to the policy. Not surprisingly, then, the cases in which the doctrine has been employed are by and large cases which utilize a principle of utmost good faith when assessing whether a given condition or set of facts justifies an insurer's avoidance of a marine insurance policy in order to prevent an undeserving insured from collecting under a previously issued policy. *See, e.g., Wisniewski*, 579 F.Supp. at 1012 (describing insurers' contentions).[24]

Pateman's action against Frenkel was rigged for a considerably different voyage. Frenkel, as an agent for a dis-

---

**24.** All the cases upon which Pateman relies deal with the question of avoidance of a policy by an insurer vis-a-vis the insured. *See, e.g., Reliance Ins. Co. v. McGrath*, 671 F.Supp. 669 (N.D.Cal. 1987); *Thebes Shipping, Inc. v. Assicurazioni Ausonia, SPA*, 599 F.Supp. 405 (S.D.N.Y.1984); *Mur–Joe Distrib., Inc. v. Reliance Ins. Co.*, 1989 A.M.C. 2015 (N.Y.Sup.Ct.1989); *Scarburgh Co. v. American Mfrs. Mut. Ins. Co.*, 107 Misc.2d 772, 435 N.Y.S.2d 997 (N.Y.Sup.Ct.1979), *aff'd*, 79 A.D.2d 942, 439 N.Y.S.2d 298, *appeal dismissed and denied*, 53 N.Y.2d 1056, 442 N.Y.S.2d 501, 512, 425 N.E.2d 889, 900 (1981). *Royal Ins. Co. v. Cathy Daniels, Ltd.*, 684 F.Supp. 786 (S.D.N.Y. 1988), is cut from the same cloth, *see, e.g., id.* at 791–92, with the added wrinkle that the insured was allowed to recover for the errors and omissions of its own insurance agent (which led to the voiding of the policy). *Id.* at 792. This last holding offers no solace to Pateman, a suitor seeking to impose tort liability not on his own representative (who would owe him a fiduciary duty), but on the insured's representative (who would not).

closed principal, had neither an entitlement to the benefits of the insurance contract nor any responsibility for its burdens. *See* Restatement (Second) Agency § 320 (1958). The action against Frenkel was not founded upon the policy. The action was not a contest between insured and insurer. To the contrary, Pateman's suit sounded in tort, charging deceitful misconduct attributable to one not a party to the insurance contract or otherwise specially beholden to the carrier. We do not think that the cases cited by Pateman can be extended to encompass the present situation, where an insurer seeks to recover damages from the insured's broker for nondisclosure or misrepresentation of material facts. We hold that the *Stecker* and *uberrima fides* doctrines, as thus far articulated by the New York courts, are limited to contract-based controversies between insurer and insured.[25]

To be sure, apart from rules which apply to parties in privity of contract, there is arguably some support in New York jurisprudence for relaxing the intent-to-deceive requirement in certain tort cases of a particularly egregious stripe.[26] But, given the setting in which these appeals arise, arguing about the necessity of demonstrating duplicitous intent on Frenkel's part strikes us as a rather rufescent herring. The court below charged the jury, "if you determine by a preponderance of the evidence that Frenkel, in obtaining the contract of insurance, withheld or failed to disclose fully material facts with intent to deceive Pateman, you must find for Pateman on its

claim against Frenkel." R.A. 2479a. The court directed the talesmen to apply the preponderance standard to *all* the elements of the fraudulent concealment claim. This use of a lesser standard of proof was itself erroneous, wholly apart from the court's instructions on intent to deceive. We explain briefly.

■ Under New York law, even if, as Pateman urges, the intent-to-deceive component was surplusage—a thesis on which we take no view—it was nonetheless essential for Pateman to prove each of the remaining elements of the tort, i.e., that Frenkel (1) intentionally withheld or failed fully to disclose (2) facts (3) material to the risk (4) with the result that Pateman relied thereon (5) to his detriment. *See Van Alen,* 441 F.Supp. at 403 (outlining elements of common-law fraudulent concealment claim; applying New York law); *Chopp v. Welbourne & Purdy Agency, Inc.,* 135 A.D.2d 958, 522 N.Y.S.2d 367, 368 (1987) (similar). And, each of these elements had to be proven clearly and convincingly. *See Chopp,* 522 N.Y.S.2d at 368; *Orbit Holding Corp. v. Anthony Hotel Corp.,* 121 A.D.2d 311, 503 N.Y.S.2d 780, 782 (1986) (per curiam); *Wayne County Vinegar,* 460 N.Y.S.2d at 217; *see also Van Alen,* 441 F.Supp. at 403 (evidence of fraud must be "clear and convincing" and the inference of fraud must be "unequivocal"); *Pittsburgh Coke & Chem. Co. v. Bollo,* 421 F.Supp. 908, 924 (E.D.N.Y.1976) (same), *aff'd* 560 F.2d 1089 (2d Cir.1977); *cf. Ratay v. Lincoln Nat. Life Ins. Co.,* 378

---

**25.** Pateman's effort to cram this square peg of a diversity case into a round state-law hole is particularly disconcerting under the circumstances at bar. It was Pateman which chose a federal forum, electing to bring suit against Frenkel in Rhode Island's federal district court instead of suing in a New York state court. We are reminded once again "that litigants who reject a state forum in order to bring suit in federal court under diversity jurisdiction cannot expect that new [state-law] trails will be blazed." *Ryan,* 916 F.2d at 744. *Accord Porter v. Nutter,* 913 F.2d 37, 40–41 (1st Cir.1990); *Croteau v. Olin Corp.,* 884 F.2d 45, 46 (1st Cir.1989); *Cantwell v. Univ. of Mass.,* 551 F.2d 879, 880 (1st Cir.1977).

**26.** It has been said, for instance, that:

The charge of fraudulent intent, in an action for deceit, may be maintained by proof of a statement made as of the party's own knowledge, which is false; provided the thing stated is not merely a matter of opinion, estimate, or judgment, but is susceptible of actual knowledge; and in such case it is not necessary to make any further proof of an actual intent to deceive. The fraud consists in stating that the party knows the thing to exist when he does not know it to exist; and, if he does not know it to exist, he must ordinarily be deemed to know that he does not.

*Church v. Wickwire,* 231 A.D. 249, 247 N.Y.S. 100, 107 (1931) (quoting *Chatham Furnace Co. v. Moffatt,* 147 Mass. 403, 18 N.E. 168, 169 (1988)).

F.2d 209, 212 (3d Cir.) (in suit to recover on insurance policy, district court committed plain error, requiring retrial, when court instructed jury that the elements of the insurer's fraud defense needed to be proven only by a "fair preponderance of the credible evidence") (construing Pennsylvania law), *cert. denied,* 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967). Inasmuch as the jury in this case was allowed to find *all* the essential elements of Pateman's claim by a mere preponderance of the evidence, a mistake was made.

### D. *Harmlessness.*

■ We shall not tarry over Pateman's importuning that any errors in the charge were benign. As a general proposition, we are confident that application of the wrong standard of proof, if the variance was substantial and worked to the detriment of the losing party, will ordinarily require retrial. *See Gardner v. Wilkinson,* 643 F.2d 1135, 1137 (5th Cir. Unit A 1981) (misstatement of burden of proof is reversible error if harmful to losing party); *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1012 (1st Cir.1979) (similar); *Barr Rubber Prods. Co. v. Sun Rubber Co.,* 425 F.2d 1114, 1120–21 (2d Cir.) (similar), *cert. denied,* 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115 (1970); *see generally Allen v. Chance Mfg. Co.,* 873 F.2d 465, 469 (1st Cir.1989) (an erroneous jury instruction necessitates a new trial "if the error could have affected the result of the jury's deliberations"); *cf. Mix v. Neff,* 99 A.D.2d 180, 473 N.Y.S.2d 31, 34 (1984) (new trial not necessary on deceit claim where jury was erroneously instructed to decide issue on "fair preponderance" rather than "clear and convincing" quantum of proof

because error favored appellant and was, therefore, harmless). So here. Whether or not intent to deceive was a necessary element of Pateman's nondisclosure claim against Frenkel, New York law, properly construed, required Pateman to prove all the elements of the tort by clear and convincing evidence.

In sum, the district court erred in charging the jury on the quantum of proof applicable to Pateman's tort claim against Frenkel. A preserved instructional error requires a new trial if, on the record as a whole, a reviewing court cannot say with fair assurance that the judgment was likely unaffected. *See Gardner,* 643 F.2d at 1137; *see also Jerlyn Yacht Sales, Inc. v. Roman Yacht Brokerage,* 950 F.2d 60, 69 (1st Cir.1991) (applying standard). Here, the error had more than a merely theoretical impact.[27] The case was hotly contested and, until the jury spoke, the outcome was problematic. Thus, the failure of the district court to instruct the jury on the proper quantum of proof may well have swayed the outcome. The error, then, was not harmless. Frenkel, having requested a more befitting instruction and taken a timeous objection to the charge as framed, has standing to complain. Accordingly, the judgment against Frenkel cannot stand.

## V. CONCLUSION

In this bitterly disputed case, the parties' relentless pursuit of gold (or its cash equivalent) has taken the district court, and this court, through a myriad of issues—some genuine, some inaurate. Happily, having reached this juncture, we need go no further.[28]

---

**27.** We cite but one illustration of the point. The record reveals that a central feature, if not the very linchpin, of Frenkel's defense was its claim that the two undisclosed incidents were immaterial to Pateman's acceptance of the risk. *See, e.g.,* R.A. 2413a–14a (jury summation of Frenkel's trial counsel). Materiality is one element of the charged tort that a jury, on this record, could have decided either way. Pateman should have been required to prove materiality by clear and convincing evidence. No such requirement was imposed.

**28.** Frenkel having prevailed on its appeal, nothing would be gained by running the gauntlet of

its asseverational array. Frenkel's sufficiency-of-the-evidence arguments fail for essentially the same reasons that Putnam's parallel arguments failed. *See supra* Part III(A); *see also supra* note 15. Its arguments based on Fed. R.Civ.P. 9(b) are, in a word, jejune. And its remaining theses, to the extent preserved, are rendered moot by our order granting it a new trial. Those points will arise afresh, if at all, on a different record and in a divergent procedural posture. It would, therefore, be idle for us to comment on them.

To sum up, our assay reveals that Putnam's arguments, though ably made by distinguished appellate counsel, consist more of dross than of gold. As between Putnam and Pateman, the jury verdict was free from cognizable error and was dispositive of both the complaint and the counterclaim. Consequently, the judgment entered by the district court was lawful. Frenkel, on the other hand, has mined a more enriching vein. The verdict Pateman obtained against it was seriously tarnished by the incidence of instructional error.

Consequently, the judgment entered below in Pateman's suit against Frenkel must be vacated and the case remanded for a new trial.[29]

*In No. 91–1307, the appeal is rejected and the underlying judgment is affirmed. In No. 91–1308, the appeal is sustained in relevant part, the underlying judgment is vacated, and the case is remanded to the district court for retrial. Costs in favor of the appellees in No. 91–1307 and the appellant in No. 91–1308.*

## APPENDIX
### JURY INTERROGATORIES AND ANSWERS
### JURY VERDICT FORM—QUESTIONS

YOU MUST RENDER YOUR VERDICT ON THIS FORM. YOU MUST ANSWER THE QUESTIONS IN ORDER.

1. DO YOU FIND DEFENDANT PATEMAN LIABLE TO PLAINTIFF PUTNAM?

    _____YES                    ___✓_____NO

    (IF YOU HAVE ANSWERED "YES," PROCEED TO QUESTION 2.)

    (IF YOU HAVE ANSWERED "NO," PROCEED TO QUESTION 4.)

2. WHAT IS THE TOTAL AMOUNT YOU FIND PATEMAN LIABLE TO PUTNAM, WITHOUT INCLUDING ANY AMOUNT ALREADY PAID TO PUTNAM?

    $_____

3. DO YOU FIND DEFENDANT PATEMAN LIABLE FOR SUE AND LABOR EXPENSES?

    _____YES                    _____NO

    IF YOUR ANSWER IS YES, WHAT IS THE AMOUNT OF YOUR AWARD?

    $_____

4. IF YOU FIND THE DEFENDANT PATEMAN NOT LIABLE TO PLAINTIFF PUTNAM, PLEASE STATE THE REASON OR REASONS:

    a. ___✓___ PLAINTIFF PUTNAM HAS FAILED TO CARRY ITS BURDEN OF PROOF.

    b. ___✓___ DEFENDANT PATEMAN HAS PROVEN ITS DEFENSE OF THE INFIDELITY EXCLUSION.

    c. ___✓___ DEFENDANT PATEMAN HAS PROVEN ITS DEFENSE OF NON–DISCLOSURE OF A MATERIAL FACT.

    IF YOU HAVE ANSWERED "NO" TO QUESTION 1, AND HAVE CHECKED "C" TO QUESTION 4, YOU SHOULD PROCEED TO QUESTIONS 5 AND 6.

5. WE THE JURY, AS TO THE ISSUE OF PLAINTIFF PATEMAN'S CLAIM AGAINST DEFENDANT FRENKEL, FIND

    _____✓_____LIABILITY                    _____NO LIABILITY

    (IF YOU HAVE ANSWERED "NO LIABILITY," GO NO FURTHER.)

    (IF YOU HAVE ANSWERED "LIABILITY," PROCEED TO QUESTION 6.)

---

**29.** The fact that we remand for a new trial does not in any way suggest that Pateman, if he recovers in full on the verdict against Putnam, can effect a duplicative recovery against Frenkel. Where compensatory damages are awarded to redress a particular loss, the injured party is entitled to satisfaction in full, but no more, regardless of the number of defendants found liable or the number of legal theories advanced.

6. WE THE JURY FIND DEFENDANT FRENKEL LIABLE TO PLAINTIFF PATE-MAN IN THE AMOUNT OF $two million dollars.

s/Frederick M. Kowal
FOREPERSON SIGNATURE

March 3, 1990
DATE