**ROYAL INSURANCE COMPANY OF AMERICA, Plaintiff,**

v.

**CATHY DANIELS, LTD., Defendant.**

**CATHY DANIELS, LTD., Third-Party Plaintiff,**

v.

**ALEXANDER & ALEXANDER, INC., and American Coverage Corp., Third-Party Defendants.**

No. 85 Civ. 8665 (RWS).

United States District Court, S.D. New York.

March 31, 1988.

---

Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City (Casper F. Ewig, John F. Ryan, of counsel), for plaintiff.

Blodnick, Pomeranz, Reiss, Schultz & Abramowitz, P.C., Lake Success, N.Y. (Jules A. Epstein, of counsel), for defendant and third-party plaintiff.

Wilson, Elser, Moskowitz, Edelman & Dicker, New York City (James M. Kaplan, Albert A. Foster, Jr., of counsel), for third-party defendants.

## OPINION

SWEET, District Judge.

Plaintiff Royal Insurance Company of America ("Royal") brought this action to void its policy of insurance issued to Cathy Daniels Ltd. ("Cathy Daniels"). Cathy Daniels counterclaimed for the payment of losses under the policy and for attorneys' fees and brought a third-party action against its broker Alexander & Alexander, Inc. and American Coverage Corp. (collectively "A & A") for negligence and breach of contract. Upon the findings and conclusions set forth below, judgment will be entered voiding the policy and granting damages to Cathy Daniels against A & A.

*Prior Proceedings*

The action was filed on November 4, 1986, discovery proceeded, and the third-party action against A & A was filed. Leave to file a fourth-party complaint was denied on September 4, 1987. The case was tried before the court on January 4, 5, 6 and 18, 1988. Final submissions and argument were had on February 1, 1988.

*Facts*

Royal is a New York corporation and is duly licensed to write policies of insurance, including marine and other types of insurance which are at issue here. Cathy Daniels is also a New York corporation with offices in New York City. Cathy Daniels was formed on July 16, 1984 to manufacture women's sportswear. As a part of that business, Cathy Daniels both imported and purchased cloth domestically which it then forwarded to contractors who produced piece goods to be sold to Cathy Daniels' customers. Cathy Daniels is operated by its two individual shareholders, Steven Chestler ("Steven") and Daniel B. Chestler ("Dan"), respectively President and Vice-President, each owning 10% of the company's stock. Eccobay Sportswear Inc. ("Eccobay") holds the remaining 80% of the stock of Cathy Daniels.

A & A is a Delaware corporation engaged in the business of brokering insurance policies, including marine and other types of insurance which are at issue here. American Coverage Corp. ("ACC") was en-

gaged in a similar business and in January 1985 was absorbed into A & A which has assumed responsibility for ACC's act.

Prior to 1984, Eccobay manufactured and sold women's sportswear at a somewhat lower price level than Cathy Daniels but in substantially the same fashion. Eccobay is wholly owned and operated by Herbert Chestler ("Herbert"), the father of Dan and Steven. For a period of approximately 20 years prior to April 1985, Stanley Kohen ("Kohen") as an owner of the brokerage firm of Foster, Kohen & Co. and later as an officer of ACC, and a Vice-President of A & A, was the broker engaged by Eccobay to place business insurance, including marine insurance.

From 1980 until 1984, Kohen arranged ocean marine and inland movement insurance coverage for Eccobay. Prior to 1985, Kohen had been involved in insurer litigation arising out of a alleged misrepresentations of prior loss history. During the period when Kohen obtained insurance for Eccobay he administered the policies and maintained files on any losses for which claims were made. In the course of the changes in the form in which Kohen did business, some of these files were lost. However, certain claims are known to have been made on behalf of Eccobay. These include a claim against a Provident & Washington policy, a claim against an Insurance Company of America policy in the amount of $850,000, and certain other claims totalling in excess of $1.6 million. In December 1983, Eccobay suffered a $106,000 loss, and the risk was thereafter declined.

Having suffered substantial losses, Herbert determined in 1984 to close Eccobay's facilities in the United States and to do business through his two factories in the Dominican Republic, thereby eliminating his company's need for the ocean marine insurance previously provided by Kohen. Also in 1984 Cathy Daniels was formed to do business in the women's sportswear field. Dan and Steven, who had been officers of Eccobay, became officers, directors and day-to-day managers of Cathy Daniels which used Herbert's and other factories to

manufacture goods. Cathy Daniels, as a subsidiary of Eccobay, was structured to enable it to carry forward Eccobay's losses. It is a fair inference that the formation of Cathy Daniels and the change of business of Eccobay, its parent, constituted the continuation of essentially the same business, albeit in a slightly different price range.

At the time Cathy Daniels was formed, Kohen called at the joint offices of Eccobay and Cathy Daniels and met initially with Herbert, who, according to Kohen, advised him that the boys were going out on their own and that he, Herbert, would have nothing to do with the new enterprise. When pressed, Kohen amplified this statement to include a representation by Herbert that Cathy Daniels was 100% owned by the boys, which was not true. At Herbert's request, Kohen went to a nearby office to confer with Dan and Steven.

No party to the meeting between Kohen, Dan and Steven recalls any questions or statements concerning the ownership of Cathy Daniels. The discussion covered the anticipated method of operation and sites for Cathy Daniels' business. On August 9, 1984, Kohen, through ACC, obtained ocean marine and inland movement insurance coverage from Fireman's Fund Insurance Company ("Fireman's Fund") for Cathy Daniels.

On September 1 and October 16, 1984, Cathy Daniels' samples were stolen from its showroom resulting in claims for losses in the amount of $60,000. Because the thefts were from a showroom and an employee was implicated, a question arose as to whether the claims should be consolidated, and whether they should be considered as fidelity or burglary losses. Kohen and ACC were familiar with the claims and processed them on behalf of Cathy Daniels.

On February 15, 1985, Fireman's Fund requested Kohen, indirectly through Crum & Foster, to replace the insurance. It was replaced by a policy issued by International Marine Underwriters ("IMU"), a division of Crum & Foster. At the time of IMU's issuance of the replacement policy an issue was raised on behalf of Cathy Daniels as to

the wording and coverage of the policy as it related to overseas shipments.

Shortly thereafter in early March 1985, David Mackintosh ("Mackintosh"), the manager and underwriter for Royal's marine specialty department with eleven years experience as an underwriter, was foraging on Long Island for new business from brokers. He met with Kohen and Walter Morgenthaler ("Morgenthaler"), the employee at ACC, other than Kohen, most familiar with the Cathy Daniels account and the three men discussed Cathy Daniels. Mackintosh sought to take "the sting" out of a prior policy he had written on which Kohen had been the broker and in which there had been substantial losses (the "Nyleve Policy").

In a telephone conversation on April 10, Kohen told Mackintosh that Cathy Daniels was a spin-off of another company, that its managers were experienced in their field and that Cathy Daniels was a new venture with one prior fidelity loss in the amount of $16,000. Mackintosh and Kohen also discussed the difficulties with the IMU coverage. Mackintosh expressed interest in underwriting Cathy Daniels' insurance and on April 11, 1985 called back to state the terms on which Royal would issue a policy. Mackintosh at no time made any further inquiries concerning Cathy Daniels or the facts described by Kohen and Morgenthaler and received no further information. He did not use or complete Royal's preprinted application form.

Mackintosh bound the risk effective April 11, 1985. On May 8, 1985 A & A forwarded a binder to Royal. The policy was typed and mailed out on June 5, 1985. The policy required the submission of declarations of shipment and stated that failure to submit declarations would render the policy null and void. Declarations of inland locations were also required.

Cathy Daniels and its officers relied upon A & A to provide insurance coverage and to process all forms and claims. Dan and Steven were not advised of the details or the procedures to be followed under the policies or of the fact that the policy was replaced twice over a period of ten months.

On June 4, 1985, while en route from Cowan Sportswear ("Cowan") in Alabama to Cathy Daniels in New York, a truck carrying $146,352.54 of Cathy Daniels' merchandise was stolen. Although many of the items were later recovered with the help of law enforcement officials, Cathy Daniels sustained a loss in the amount of $95,092.40 (the "Cowan loss"), which it submitted to Royal.

From time to time, Cowan had been engaged by Cathy Daniels to do contract garment manufacturing work and it had been included as a processing location under Cathy Daniels' policies. Some time in 1985, Cowan leased a tractor-trailer which it used to ship merchandise from its plant in Alabama to the New York area instead of employing a common carrier. Cathy Daniels was one of Cowan's primary customers and users of the trucking facility. An oral agreement was reached between Cowan and Dan that the Cowan tractor-trailer would be used for shipments of Cathy Daniels' goods, rather than a common carrier. Pursuant to this oral agreement Cowan would have the benefit of Cathy Daniels' insurance.

Article XI of the policy issued by Royal to Cathy Daniels provides, in part:

This insurance shall be void if the Assured shall enter into any special agreement with carriers releasing them from their common law or statutory liability or agreeing that this insurance shall in any way inure to the benefit of such carrier....

The shipment from Cowan to Cathy Daniels was made pursuant to a uniform straight bill of lading. The terms and conditions of the uniform straight bill of lading state, in part:

c. Any carrier or party liable on account of loss or damage to any of said property shall have the full benefit of any insurance that may have been effected upon or on account of said property, so far as this shall not avoid the policies or contracts of insurance: provided, that the carrier reimburse the claimant for the premium paid thereon.

On June 7, 1985, Cathy Daniels suffered another theft when a truck carrying $101,775.00 of Cathy Daniels' cargo was stolen from a lot in Brooklyn, New York (the "RBC Trucking loss"). No part of that cargo was ever recovered, and on June 10, 1985, Cathy Daniels filed a claim with Royal for $109,125.00, which included the value of the cargo and the containers and racks.

In addition to the Cowan and the RBC Trucking losses, Cathy Daniels sustained a number of smaller losses between April 19 and June 25, 1985 which were presented to Royal. All of these losses were below the policy deductible except for one claim in the amount of $1,330.00 which was sustained on June 25, 1985. The dollar amount of all the claims is not in dispute.

Peggy Beauchamp ("Beauchamp"), a senior claims adjuster for Royal, was advised of the Cowan and RBC Trucking losses on June 4 and 10, 1985, respectively. She informed Mackintosh who, on June 11, 1985, ordered the cancellation of the policy. Through investigation and the fortuity that the investigator knew of the prior Cathy Daniels' claim on the Fireman's Fund policy, Beauchamp learned of the losses suffered by Cathy Daniels in the fall. She also learned of the possibility that Cathy Daniels was not a new enterprise but simply a change in the name of an ongoing business.

The June 11, 1985 notice to Cathy Daniels cancelled the policy effective July 23, 1985. On June 19, 1985 Royal sent an additional notice to Cathy Daniels cancelling Endorsements 3, 4 and 5 effective June 28, 1985, since those endorsements required only five day notice for cancellation. The notices stated "underwriting reasons" as the basis for the cancellations.

On August 9, 1985, A & A wrote to Royal advising that Royal should cancel the policy for nonpayment of premiums. However, on August 15, 1985 A & A wrote to Royal requesting the policy be reinstated since the premium had been paid in the meantime. Having retained counsel, Royal wrote in response on August 23, advising Kohen that it could not reinstate the policy since it was already cancelled. In the let-ter of August 23, Royal reserved the right to void the policy on the grounds of a failure to disclose the risk.

On September 13, 1985 Royal wrote a letter to Cathy Daniels voiding the policy on the grounds that the assured failed to make a full disclosure of the risk and that Cathy Daniels had failed to submit declarations of shipments in accordance with the terms of the policy. The deposit premium under the Warehouse Endorsement was tendered, but tender was refused by A & A on behalf of Cathy Daniels. On September 13 Cathy Daniels obtained ocean cargo marine coverage through Johnson & Higgins. There is no evidence of prejudice to Cathy Daniels other than the refusal to pay the claims, nor has any act of reliance by Cathy Daniels upon Royal's conduct been established.

Daniel St. Jacques, an expert in the field of marine insurance testified on the doctrine of *uberrima fidei,* or utmost good faith, which is known in the insurance industry and is a trade practice adopted by brokers and relied upon by underwriters. Among the relevant facts considered by underwriters include management experience of the concern seeking to be insured, its loss history for the five years preceding the underwriting, its relationship to any predecessor or related firms and the loss history of such firms if commonly managed, and the underwriting history including any prior policies and reasons for their cancellation or replacement.

During the duration of the Royal policy, no "Declarations of Value" as required by the policy were supplied. The declarations are necessary for coverage and billing purposes. It was the practice of A & A to prepare such declarations when given forms by the insurer and when requested to submit forms. No request was made of Cathy Daniels for such declarations prior to the cancellation. Royal had a practice of requesting forms from insureds who were delinquent in submitting forms, but there was no evidence that Royal had provided such forms to A & A or Cathy Daniels. Royal has not previously cancelled a policy for late submissions of Declarations of Val-

ue forms. Therefore, although Royal has asserted Cathy Daniels' failure to submit timely declarations as grounds for voiding the policy, on these facts there is no basis for voiding the policy on such grounds, and this claim will not be considered further.

*The Royal Insurance Policy*

■ In *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9 (2d Cir.1986), this Circuit set forth the legal principles that govern Royal's attempt to void the Cathy Daniels' policy on the grounds that Cathy Daniels' agent, A & A, failed to disclose material facts concerning the risk:

It is well-established under the doctrine of *uberrima fidei* that the parties to a marine insurance policy must accord each other the highest degree of good faith. *Puritan Ins. Co. v. Eagle S.S. Co. S.A.*, 779 F.2d 866, 870 (2d Cir.1985). This stringent doctrine requires the assured to disclose to the insurer all known circumstances that materially affect the risk being insured. Since the assured is in the best position to know of any circumstances material to the risk, he must reveal those facts to the underwriter, rather than wait for the underwriter to inquire. *Id.*, The standard for disclosure is an objective one, that is, whether a reasonable person in the assured's position would know that the particular fact is material. *Btesh v. Royal Ins. Co.*, 49 F.2d 720, 721 (2d Cir.1931). To be material, the fact must be "something which would have controlled the underwriter's decision" to accept the risk. *Id.* The assured's failure to meet this standard entitles the underwriter to void the policy *ab initio. Puritan Ins. Co.*, 779 F.2d at 870–71.

*Knight v. U.S. Fire Ins. Co.*, 804 F.2d at 13.

The proof at trial established that Kohen told Mackintosh only a fraction of the information Kohen possessed concerning Cathy Daniels. In substance, Kohen told Mackintosh that Cathy Daniels was a spin-off of another company, that its managers were experienced in the women's sportswear business, and that it had suffered one prior fidelity loss in the amount of $16,000.

There is no dispute that Kohen failed to tell Mackintosh: (1) that the fidelity loss had been presented to Fireman's Fund, Cathy Daniels' initial insurer, as a claim for $60,-000; (2) that Fireman's Fund had thereafter requested A & A to replace the policy with another insurer's, which request was tantamount to a cancellation; (3) that there was a close family relationship between the principals of Cathy Daniels and the prior company, Eccobay; and (4) that the prior company, Eccobay, had a long and substantial loss history marked by litigation involving insurance carriers and brokers. These facts were known to Kohen, who had done business with Herbert Chestler for twenty years and had obtained not only business but also personal insurance for him. Thus, Kohen was in the best position to know of any circumstances material to the risk. *See Knight v. U.S. Fire Ins. Co.*, 804 F.2d at 13. It is fair to conclude that Kohen was aware that Cathy Daniels was created to continue Herbert's garment business albeit in a form that would be advantageous from a tax point of view and would permit the boys, Dan and Steven, to assume more control over day-to-day operations.

Crediting Mackintosh's testimony that knowledge of the $60,000 claim on the Fireman's Fund policy would have affected his decision to issue the policy and that knowledge of Eccobay's loss history would have precluded Royal's insurance of a policy to Cathy Daniels, the materiality of Kohen's nondisclosures is not in doubt. The testimony of Royal's expert on marine insurance supports this conclusion. Kohen knew of, but failed to disclose, information relating to each of the factors described by the expert as relevant to the insurer's decision. Kohen testified at trial, contrary to Mackintosh's testimony, that Mackintosh never inquired about the loss history of the prior company. Materiality, however, is not defined solely by what inquiries the insurer makes or fails to make. The issue is whether a reasonable person in the assured's, or the broker's, position would know that a particular fact is material. *Btesh v. Royal Ins. Co.*, 49 F.2d 720, 721 (2d Cir.1931). Thus, even if Kohen's testimony in this regard were credible, which it

is not, Mackintosh's failure to question does not diminish the materiality of the facts not disclosed, nor does it excuse Kohen's failure to make them known. As the Court held in *Knight*, the broker "must reveal [material] facts to the underwriter, rather than wait for the underwriter to inquire." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d at 13.

The facts concerning Cathy Daniels' prior claims on the Fireman's Fund policy and its close relationship with Eccobay were not matters generally known to the marine insurance business community. *Cf. Anne Quinn Corp. v. American Manufacturers Mut. Ins. Co.*, 369 F.Supp. 1312 (S.D.N.Y. 1973) (insured's failure to disclose alleged practice of overloading did not permit voiding policy). Moreover, Kohen's disclosure to Mackintosh that Cathy Daniels was a spin-off of another company was not sufficient to call Mackintosh's attention to the possibility that Cathy Daniels might for all intents and purposes be simply a successor to the former business. *Cf. Puritan Ins. Co. v. Eagle S.S. Co.*, 779 F.2d 866, 871 (2d Cir.1985); *see also* 2 M. Mustill & J. Gulman, *Arnould's Law of Marine Insurance and Average* § 646 at 493 (16th ed. 1981). In sum, Kohen's failure to meet the standards of disclosure under the doctrine of *uberrima fidei* entitles Royal to void the policy *ab initio.*[1]

### Liability of Broker to its Principal

■ In *Port Clyde Foods Inc. v. Holiday Syrups, Inc.*, 563 F.Supp. 893 (S.D.N.Y.1982), this court examined the liability of a broker under New York law for the uninsured losses suffered by its principal:

New York courts have held that an insurance broker is liable for failure to acquire coverage providing for the requested risks. "An insurance broker is liable for the loss incurred by his principal due to the agent's failure to exercise reasonable diligence in obtaining effective insurance coverage on the principal's behalf...." *Wings & Wheels Express, Inc. v. Sisak*, 73 Misc.2d 846, 342 N.Y.S. 2d 891, 895 (Sup.Ct.1973) (citations omitted).

*Port Clyde Foods, Inc. v. Holiday Syrups, Inc.*, 563 F.Supp. at 897. There is no dispute that Cathy Daniels entrusted A & A with full responsibility for procuring and maintaining marine and inland movement insurance coverage. Thus A & A was under a duty to exercise skill, care and diligence in procuring coverage for Cathy Daniels. *See Israelson v. Williams*, 166 A.D. 25, 151 N.Y.S. 679 (2d Dept.), *appeal dismissed*, 215 N.Y. 684, 109 N.E. 1079 (1915). Kohen's procurement of a voidable policy through his failure to disclose known facts material to the risk constitutes a breach of A & A's duty as a broker. Therefore, A & A is liable to Cathy Daniels for the losses for which Cathy Daniels could have recovered from Royal if the policy had been properly obtained. *See Kinns v. Schulz*, 131 A.D.2d 957, 516 N.Y. S.2d 817, 819 (3d Dep't 1987).

■ An issue was raised as to which of the losses would have been insured but for A & A's negligence. There was evidence that Cathy Daniels had entered into an oral agreement with Cowan giving Cowan the benefit of Cathy Daniels' insurance and releasing Cowan from liability to Cathy Daniels for losses of goods being carried on Cowan's truck. Although Dan testified

---

1. Cathy Daniels contends that Royal's conduct in adjusting the Cowan and RBC Trucking losses combined with its delay in attempting to void the policy preclude Royal from voiding the policy under the doctrines of waiver and estoppel. As to the issue of waiver, there is no evidence that Royal intended to give up its right to void the policy. *See Weiner v. Government Employees Inc. Co. of Washington, D.C.*, 52 A.D.2d 844, 382 N.Y.S.2d 814, 815 (2d Dep't 1976). To the contrary, within a reasonable time after having cancelled the policy in mid-June and after investigating reports that the risk may have been misrepresented, Royal wrote to A & A in mid-

August and expressly reserved its right to void the policy on the grounds of a failure to disclose the risk. *Cf. Guardian Life Ins. Co. v. Weiser*, 51 N.Y.S.2d 771, 773 (Sup.Ct.1941), *aff'd* 268 A.D. 2d 901, 51 N.Y.S.2d 457 (1st Dep't 1944). As to the issue of estoppel, no evidence was adduced to show that Cathy Daniels was in any way prejudiced by Royal's acts. *See Walsh v. Prudential Ins. Co. of America*, 101 A.D.2d 988, 477 N.Y.S.2d 473 (3d Dep't 1984), *aff'd*, 64 N.Y.2d 1053, 489 N.Y.S.2d 902, 479 N.E.2d 247 (1985); *Poland v. Transamerica Ins. Co.*, 53 A.D.2d 140, 385 N.Y.S.2d 987, 990 (4th Dep't 1976).

that such an agreement never existed, Don Cowan's deposition testimony establishes that the release was part of a broader oral agreement between the two companies concerning the transport of Cathy Daniels' goods. Don Cowan testified that Cathy Daniels had expressed its dissatisfaction with the common carriers that had been employed to transport goods from Cowan's warehouse in Alabama to Cathy Daniels in New York. Cowan offered to transport the goods with its own truck upon suitable terms. Thus, an agreement was reached whereby Cowan would perform the trucking and would receive the benefit of Cathy Daniels' insurance. Based in part on the parties' understanding that Cowan could not afford to insure Cathy Daniels' goods while they were in Cowan's possession, this arrangement conformed to the companies' established practice of extending the insurance under Cathy Daniels' policies to the goods while they remained on Cowan's premises.

New York law requires that a release contain "an explicit, unequivocal statement of a present promise to release [a party] from liability." *Carpenter v. Machold*, 86 A.D.2d 727, 447 N.Y.S.2d 46, 47 (3d Dep't 1982). Any words may be used to effect a release, so long as they manifest the releasor's intent to discharge. *Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261, 263 (2d Cir.1965); *Pratt Plumbing & Heating, Inc. v. Mastropole*, 68 A.D.2d 973, 414 N.Y. S.2d 783, 784–85 (3d Dep't 1979). The intent of the parties determines the scope of a release. *Gordon v. Vincent Youmans, Inc.*, 358 F.2d at 263.

Cathy Daniels contends that the release is not enforceable because, as Don Cowan testified, it was an oral agreement that was never reduced to a writing. However, although a release that is not supported by consideration must be in writing, *see* N.Y. General Obligations Law § 15–303 (McKinney's 1978), New York law does not require a writing where there is supporting consideration. *Bank of United States v. Manheim*, 264 N.Y. 45, 49, 189 N.E. 776 (1934). Therefore, the oral release given by Cathy Daniels in exchange for trucking services provided by Cowan is enforceable. More-

over, the release was a "special agreement" which under Article XI of the Royal policy would have voided the coverage and permitted Royal to disclaim liability for the Cowan loss. Therefore, because Cathy Daniels' own acts would have precluded its recovery on the Cowan loss, A & A is liable to it only for the RBC Trucking loss.

Upon the findings and conclusions set forth above, the policy is void. Judgment will be entered in favor of Cathy Daniels on its third-party complaint against A & A in the amount of $101,775.00, with interest thereon as provided by law. The parties are directed to submit judgment on ten (10) days notice.

IT IS SO ORDERED.