CIGNA PROPERTY AND CASUALTY IN-SURANCE COMPANY; Cigna Group of Companies; David F. Allen; Alliance Marine Risk Managers, Inc., et al., Plaintiffs–Counter– Defendants–Appellees,

v.

POLARIS PICTURES CORPORATION; U.S. Inbanco, Ltd., Defendants–Counter– Claimants–Appellants.

CIGNA PROPERTY AND CASUALTY IN-SURANCE COMPANY; Cigna Group of Companies; David F. Allen; Alliance Marine Risk Managers, Inc., Plaintiffs–Appellees,

v.

POLARIS PICTURES CORPORATION; U.S. Inbanco, Ltd.; Rex K. De George, Defendants–Appellants.

Nos. 96–56252, 96–56789.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 7, 1998.

Decided Oct. 22, 1998.

Elliot L. Bien, Bien & Summers, Novato, CA, for defendants-counter-claimants-appellants.

Ellis J. Horvitz, Patricia Lofton, Horvitz & Levy LLP, Encino, CA; Donald J. Sands, Neil S. Lerner, Sands, Norwitz, Forgie, Leonard & Leonard, Los Angeles, CA, for plaintiffs-counter-defendants-appellees.

Before: FLETCHER, THOMPSON and LEAVY, Circuit Judges.

THOMPSON, Circuit Judge:

Defendants/appellants Polaris Pictures Corp. (Polaris) and U.S. Inbanco Ltd. (Inbanco) appeal from the district court's judgment granting Cigna Property and Casualty Insurance Company (Cigna) rescission of a marine insurance contract on the ground of fraud.

The insurance contract was for insurance on a yacht. The district court found the insurance was obtained with the fraudulent intent to sink the yacht and collect the proceeds. We affirm the district court's rescission judgment, but not on the ground of fraud. The pleadings and uncontroverted evidence at trial support a judgment of rescission on the ground of failure to disclose material facts in the insurance application. We affirm the judgment on this ground.

We also affirm the district court's judgment awarding attorney fees in favor of Cig-na, and the court's addition of appellant Rex K. DeGeorge as a judgment debtor.

## FACTS

### A. Prologue

DeGeorge, a Beverly Hills attorney, has the remarkable experience of having owned several yachts which have been lost at sea. Each vessel was adequately insured against such loss, and except for the yacht that sank in this case, DeGeorge collected the insurance proceeds on every one of them.

### 1. The *Tutania* and the Coffee Merchant Bandits

DeGeorge began losing yachts almost three decades ago. He had been the owner of the 43–foot yacht, *Tutania*. In 1970, he was interested in selling it. When a couple of purported Peruvian coffee merchants showed an interest in the yacht, DeGeorge arranged to take them for an overnight test-run. That night, the coffee merchants drugged him and his companion. DeGeorge and his companion, still feeling ill the next morning, escaped and sailed 35 miles back to shore in the yacht's dinghy while the coffee merchants remained on board the vessel. Five days later, DeGeorge reported the theft to the police. The *Tutania* and the Peruvian coffee merchant bandits were never seen again.

The *Tutania* had been insured by the Hartford Insurance Company. After DeGeorge threatened litigation for bad-faith denial of his claim, Hartford paid DeGeorge $43,000, the full policy value.

### 2. One Moonless Night on The *Epinicia*

After he lost the *Tutania*, DeGeorge bought another vessel, this time a 57–foot racing yacht, the *Epinicia*. Six years after DeGeorge lost the *Tutania*, he was sailing the *Epinicia* off the coast of Italy with Paul Ebeling, a business acquaintance. The two men were sailing along on a starless, moonless night when about midnight they suddenly struck "a low-profile, dark object that was not visible."

Fortunately, DeGeorge had recently purchased a new dinghy. He and Ebeling, immediately realizing the danger, jumped into the dinghy and sailed back to the coast while the *Epinicia* sank in about twenty minutes. DeGeorge had insurance on the yacht and he filed a claim with the insurer, Lloyds of London. Lloyds originally declined to pay the claim, but after DeGeorge threatened litigation, they changed their position and paid him $194,000 for the loss of the yacht.

### 3. A 47–Footer Goes Down

In 1983, DeGeorge was handling a law suit on behalf of a client. The suit involved a business deal potentially worth billions. According to DeGeorge, the parties opposing the suit had decided to pursue a rather unorthodox litigation strategy, i.e., they attempted to kill him. These parties had previously suggested they might in fact nail DeGeorge's kneecaps to the floor. Although DeGeorge didn't lose his kneecaps, an attempt was made that year to kill him while he and his wife were sailing off the California coast near Los Angeles. This time, DeGeorge lost a 47–foot yacht insured for $245,000.

According to DeGeorge, a suspicious looking fishing boat circled the yacht. A little later, he and his wife were relaxing in the state room when explosions began to rock the boat. When the explosions stopped, DeGeorge and his wife jumped in a dinghy and escaped the vessel, which sank in shark-infested waters in about half an hour. DeGeorge and his wife returned to Marina del Rey in the dinghy. They did not report the incident to any authorities, but four days later reported the loss to the vessel's insurer, Fireman's Fund. Fireman's Fund eventually paid DeGeorge $245,000, the full amount of the policy.

### 4. Other Claims

According to Cigna, DeGeorge's insured losses have not been confined to ocean vessels. Cigna provided the district court with a list of claims DeGeorge made against various insurers between 1970 and 1993. These alleged claims include the following:

| Year | Claim | Amount |
|---|---|---|
| 1970 | Rolex watch stolen from unattended vehicle in Madrid | $ 1,500 |
| | Personal items and jewelry taken from an unattended taxi cab in Sydney, Australia | $ 2,000 |
| 1971 | Baggage stolen from unattended vehicle in Barcelona, (several identical claims against different combined insurers) | more than $20,000 combined |
| 1974 | Missing Jensen–Healy automobile | unknown |
| 1981 | Baggage lost by airline | $ 10,000 |
| 1990 | Baggage lost while traveling in Europe | $ 9,000 |
| 1991 | Baggage lost while traveling in Europe | $ 10,000 |
| 1992 | Paintings and personal property stolen from home | $700,000 |
| 1993 | other losses resulting from 1992 theft | undisclosed settlement with second insurer |

DeGeorge's bad luck extended beyond the loss of mere personal property. He also filed twenty-nine insurance disability claims between 1976 and 1990. In a 1990 claim, DeGeorge sought $11,000 per month because of a "bipolar personality disorder." The insurer, Monarch Insurance Company (Monarch), sought to rescind the insurance contract alleging DeGeorge had misrepresented and concealed material information in the application. However, after DeGeorge filed a counterclaim asserting breach of contract, bad faith, negligence, fraud, and negligent infliction of emotional distress, Monarch settled the claim for $550,000.

## B. The *Principe* and The Italian Connection

Having outlined this rather incredible background, we now turn to the facts giving rise to the present case: the total loss of a fourth yacht.

In June 1992, DeGeorge contracted for the construction of a 76–foot motor yacht, the *Principe di Pictor* (*Principe*), from Azimut, SpA, an Italian firm, for the purchase price of $1.9 million. While the *Principe* was still under construction, DeGeorge assigned his end of the construction contract to Continental Pictures Corp. (Continental). Continental was a Panamanian corporation, apparently located in Switzerland. Although Continental allegedly bought DeGeorge's contract for $3.6 million, Continental never paid anyone any money. In fact, after the contract was assigned to Continental, Azimut looked only to DeGeorge for progress payments. De-

George continued to make those payments to Azimut with $600,000 of his own money.

Continental then sold the *Principe* to Polaris Pictures Corp. for $3.62 million. Polaris had been formed by DeGeorge, had the same address as DeGeorge's residence and, as the district court found, was "completely controlled by him at all relevant times." Polaris had no assets other than some screenplays which the district court found to be of speculative value at best.

About two weeks before Continental sold the yacht to Polaris, DeGeorge arranged a stock swap with Tridon, a publicly traded company with no net worth. In this deal, Tridon acquired ownership of Polaris and DeGeorge acquired two million shares of Tridon stock. The stock swap agreement contained a clause which provided that all shares of Polaris stock would revert to DeGeorge if either Tridon or Polaris ever declared bankruptcy or an inability to pay their financial obligations. Because neither company had any significant assets, DeGeorge could, at any time, declare Polaris unable to pay its debts and regain his Polaris stock.

As a result of the stock swap, Tridon and not DeGeorge now owned Polaris. The district court found this agreement was entered into for the purpose of distancing DeGeorge, on paper, from Polaris's acquisition of the yacht.

Polaris financed its purchase of the yacht through notes issued by Inbanco. Inbanco was formed and controlled by DeGeorge. It was incorporated on the same day that Polaris bought the yacht from Continental. Like Polaris, Inbanco shared a common address with DeGeorge. Inbanco's only asset was apparently a $200,000 cash infusion from DeGeorge's 28–year old nephew.

After Polaris bought the yacht from Continental, Polaris allegedly entered into an agreement with Jacob Wizman, supposedly a client of DeGeorge. Wizman agreed to buy a 98% interest in the *Principe* for $3.62 Million if the yacht could be delivered to him "as new" in January 1993. Because Wizman did not respond to a subpoena, the district court questioned whether he actually existed.

Polaris and Inbanco bought marine insurance on the *Principe* from Cigna through David Allen of Alliance Marine Risk Managers, Inc. (Alliance), a Cigna agent. The insurance application submitted by Polaris and Inbanco contained no reference to DeGeorge, Continental, Tridon, Wizman or any of the transactions and close ties among them. Cigna issued a policy of insurance naming Polaris as the insured, and naming Inbanco as the loss payee. The total value of the policy if all benefits were paid out was almost $6.5 million.

On its maiden voyage, with the insurance in place, the yacht *Principe* sank off the coast of Italy. DeGeorge and two companions, Paul Ebeling and Gabriel Falco, were on board at the time. Ebeling had also been on board one of DeGeorge's other ill-fated yachts, the *Epinicia*, which also sank off the coast of Italy. Ebeling, who controlled Tridon during the Tridon/Polaris/DeGeorge stock swap, was now CEO of Polaris.

According to Ebeling and DeGeorge, the *Principe* was intentionally sunk by Sicilian drug runners posing as a trial crew for the *Principe* and seeking to escape from the Italian coast guard. As the story goes, the *Principe* was being captained by Andrea Libovich, a Yugoslavian sailor trained in the Russian navy. Ebeling and DeGeorge had met Libovich at a dockside cafe in Naples. They had previously discharged the captain provided by the ship's builder, and decided to give Libovich a shot at the captain's job with a test run on the yacht.

Libovich brought along two crewmen to help run the yacht. Although this was originally to be only a short test run, Libovich and his two crewmen each brought along two large, tightly stuffed, black duffle bags. Once the *Principe* was underway, the test run was extended overnight. During the night, the crew, brandishing guns, forced DeGeorge, Ebeling and Falco into one of the staterooms while Libovich or his crew drilled holes in the hull of the ship. Libovich told DeGeorge he was going to sink the ship.

In spite of the water then supposedly pouring into the ship's hull, Libovich spent the next four hours talking on the phone. Finally, at 6:00 a.m., Libovich and his crew,

along with their six duffle bags, left the *Principe* and boarded a speed boat, which whisked them away on a course headed for the Libyan coast.

DeGeorge, Ebeling, and Falco were left to perish on the now doomed *Principe.* Fortunately, the three were able to get into a small skiff and avoid being consumed by sharks infesting the local waters. The men remained in the area, watching as the *Principe* slowly descended into the sea.

The Italian coast guard happened by at about 12:30 p.m. By that time, only the radar unit of the *Principe* remained above the water. Although the Italians were able to raise the sinking yacht and tow it into port, the ill-fated *Principe* sank again while at the dock. When it was raised three days later, it was a total loss.

Polaris and Inbanco filed claims for the loss of the *Principe.* Cigna refused to pay the claims and instead sued for rescission of the insurance contract because neither Polaris nor Inbanco had disclosed material facts such as DeGeorge's loss history or the close ties among all the parties involved in the ownership of the *Principe.* Polaris and Inbanco counterclaimed against Cigna, Allen and Alliance claiming, among other things, breach of contract and breach of the implied covenant of good faith and fair dealing.

The district court (Judge Tashima) granted summary judgment in favor of Cigna, dismissing all of the Polaris and Inbanco counterclaims. The court reasoned that if Cigna succeeded on its rescission claim, any alleged harm to Polaris and Inbanco would "necessarily be the result of their failure to act in the utmost good faith, as required by the doctrine of *uberrimae fidei,*"[1] And, if Cigna failed in its rescission claim, "Polaris and Inbanco will be entitled to receive all benefits due under the policy, and thus, will have suffered no damage." The district court also dismissed Cigna's counterclaim for indemnity from DeGeorge. In addition, the district court denied Cigna's motion to de-

clare DeGeorge an alter ego of Polaris and Inbanco as pointless because Cigna was only seeking to rescind the contract, not recover any damages from the corporate defendants.

Another judge of the district court (Judge Letts) subsequently conducted a seven-day bench trial in admiralty on Cigna's rescission claim. Despite the fact that Cigna had not challenged the alleged facts surrounding the sinking of the *Principe,* the district court granted rescission based on fraud. According to the district court, Polaris and Inbanco had purchased the insurance from Cigna with the intent to sink the *Principe.* The court also awarded attorney fees to Cigna. The fee award was originally against both Polaris and Inbanco, but was later modified at Cigna's request to include DeGeorge as an alter ego.

Polaris, Inbanco and DeGeorge now appeal the district court's rescission judgment; DeGeorge also appeals the award of attorney fees against him personally. We have jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm, although on the ground of failure to disclose material facts in the application for marine insurance, not on the ground of fraud.

### STANDARDS OF REVIEW

■ We review de novo the district court's grant of summary judgment on the counterclaims. *See Covey v. Hollydale Mobilehome Estates,* 116 F.3d 830, 834 (9th Cir.1997), *amended by* 125 F.3d 1281 (9th Cir.1997).

■ We review the district court's findings of fact under the clearly erroneous standard of review. *Resner v. Arctic Orion Fisheries,* 83 F.3d 271, 273 (9th Cir.1996). The district court's conclusions of law are reviewed de novo. *Howard v. Crystal Cruises, Inc.,* 41 F.3d 527, 529 (9th Cir.1994).

■ "In reviewing decisions of the district court, we may affirm on any ground finding support in the record. If the decision below is correct, it must be affirmed, even if the district court relied on the wrong grounds or wrong reasoning." *Unigard Sec. Ins. Co. v.*

---

1. The doctrine of *uberrimae fidei* requires a marine insurance applicant *"even if not asked,* to reveal every fact within his/her knowledge that is material to the risk." *Certain Underwriters at*

*Lloyd's v. Montford,* 52 F.3d 219, 222 (9th Cir. 1995) (quoting *Washington Int'l Ins. Co. v. Mallone,* 773 F.Supp. 189, 191 (C.D.Cal.1990)) (emphasis added).

*Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 367 (9th Cir.1992) (quoting *Jackson v. Southern Cal. Gas Co.*, 881 F.2d 638, 643 (9th Cir.1989)).

## DISCUSSION

■ Polaris[2] first contends the district court erred in granting summary judgment dismissing its counterclaims for damages, including its claims for Cigna's alleged breach of the insurance contract and breach of the contract's implied covenant of good faith and fair dealing.

The district court correctly determined as a matter of law that if Cigna prevailed on its rescission claim, Polaris's counterclaims necessarily would be defeated. The court also determined that if Cigna failed in its rescission claim, Polaris would be entitled to the benefits of the insurance contract and would suffer no damages (presumably because the payment of interest would adequately compensate for any delay in payment of the contract's insurance proceeds).

Polaris argues that its counterclaims for damages were claims at law on which it was entitled to a jury trial, that there were common issues of law and fact between Polaris's counterclaims and Cigna's rescission claim, and that by dismissing Polaris's counterclaims prior to trial, and then proceeding with a bench trial on Cigna's rescission claim, the district court denied Polaris the right to a jury trial under the Seventh Amendment.

■ This argument assumes Polaris had the right to present its counterclaims to a jury at the same time Cigna was presenting its equitable rescission claim to the court. This is not so. The district court had the discretion to first conduct a bench trial on the equitable rescission claim. *See Dollar Systems, Inc. v. Avcar Leasing Systems, Inc.*, 890 F.2d 165, 170 (9th Cir.1989) (approving a district court bench trial on a rescission claim disposing of the case before a jury trial on the breach of contract claim). The district court's bench trial ended in a

judgment in favor of Cigna granting rescission, which judgment we affirm in this appeal. All of Polaris's counterclaims for damages, therefore, are precluded.

■ Polaris next contends that, because Cigna did not dispute DeGeorge's account of the sinking, the district court was judicially estopped from finding that the *Principe* was intentionally scuttled. We reject this argument.

■ The doctrine of judicial estoppel provides that a party may not gain an advantage "by taking one position, and then seeking a second advantage by taking an incompatible position." *Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir. 1996) (after plaintiff asserted she was unable to work for purposes of her disability claim, she could not later assert that age discrimination was the true cause for her not working). In contrast to Polaris's assertion and in contrast to *Rissetto*, Cigna did not change its position by raising the scuttling issue at trial. As Cigna points out in its brief, "Cigna did not rely upon an intentional scuttling theory at trial, ... presented no evidence to rebut DeGeorge's version of the loss, did not cross-examine DeGeorge about the facts of the loss, and did not raise a scuttling argument during opening or closing." Appellees' Brief at 56.

Rather, it was the district court that raised the scuttling issue, finding DeGeorge's "account of the scuttling so incredible that standing alone it would raise serious questions as to whether the boat was deliberately scuttled. In the face of the totality of the evidence, that conclusion is inescapable." Because Cigna did not take inconsistent positions, judicial estoppel is inapplicable.

Polaris next contends the district court erred in rescinding the insurance contract based on fraud when the fraud the district court found was not relied upon by Cigna. The district court described the fraud which it found, stating:

> In essence, the fraud intentionally concealed from Cigna the material fact that

**2.** Throughout the discussion, unless otherwise indicated, all references to Polaris include the codefendant-appellant Inbanco.

the conspirator's purpose in purchasing the insurance from Cigna was not to protect themselves against the risk of an unknown future event, but rather to precipitate an accident which would allow them to collect on it. As a result, a judgment of rescission of policy number YKR 31 59 18 issued to Polaris and Inbanco is warranted.

Cigna did not pursue a theory of fraud based upon intentional scuttling. In its complaint, Cigna alleged that Polaris and Inbanco, in applying for insurance for the *Principe,* concealed material facts. Among the concealed facts were the facts that DeGeorge had an interest in the *Principe* and had sustained and made insurance claims for the loss of at least three other yachts. Cigna also alleged that Polaris and Inbanco failed to disclose the relationships among DeGeorge, Polaris, Inbanco and Tridon. At trial, Cigna presented evidence in support of these allegations and proved the concealment of material information in the application for marine insurance. Polaris did not dispute this evidence.

■ The allegations of the complaint, the proof at trial, and the failure to dispute the facts of concealment all support the district court's rescission judgment, not on the ground of fraud, but on the ground of concealment. This is sufficient for us to affirm the district court's judgment granting rescission of the marine insurance contract. *See Unigard Sec. Ins. Co.,* 982 F.2d at 367.

■ Whether or not asked, an applicant for a marine insurance policy is bound to reveal every fact within his knowledge that is material to the risk. *Certain Underwriters,* 52 F.3d at 222.[3] An insurer may rescind an insurance contract "if it can show either intentional misrepresentation of a fact, regardless of materiality, or nondisclosure of a fact material to the risk, regardless of intent." *Washington Int'l Ins. Co. v. Mellone,* 773 F.Supp. 189, 191 (C.D.Cal.1990).

The facts Polaris and Inbanco failed to disclose were material to Cigna's risk. Polaris failed to disclose DeGeorge's ownership interest in the *Principe. Cf. Mellone,* 773 F.Supp. at 191, 193 (Co-ownership interests are material to the insurance risk). Nor did Polaris inform Cigna of DeGeorge's loss history. *Cf. Royal Ins. Co. of America v. Cathy Daniels, Ltd.,* 684 F.Supp. 786, 791 (S.D.N.Y. 1988). Polaris also failed to disclose the relationships among DeGeorge, Polaris, Inbanco and Tridon. *Cf. id.* (close ties between a corporate applicant and its principals and a second company or its principals is material to the insurance risk when the second company or its principals have a long and substantial loss history).

■ Instead of contesting the fact that they did not disclose the foregoing information to Cigna, Polaris and Inbanco argued to the district court and now to this court that Cigna itself was at fault because it "issued coverage without warning of any deficiencies" in the application! Polaris and Inbanco cite no authority to support this novel contention, which is contrary to the obligation of the applicant for marine insurance to disclose material information *whether or not the insurer asks for it. See Certain Underwriters,* 52 F.3d at 222.

Polaris and Inbanco also argue they were prejudiced by the district court's bias against them. This argument is meritless. No bias has been shown. *See Stuart v. United States,* 23 F.3d 1483, 1486 (9th Cir.1994) ("While the judge made no secret of his skepticism of appellants' position it does not necessarily follow that the judge's ultimate fact findings were erroneous.... The parties were permitted to respond to the district court's expressed concerns to the best of their ability." (quotations and citations omitted)).

■ Finally, Polaris contends the district court erred by including DeGeorge as a non-

3. This principle, known as *uberrimae fidei* exists under both California insurance law, *see* Cal. Ins.Code § 1900, and federal admiralty law. *See Pacific Queen Fisheries v. Symes,* 307 F.2d 700, 708 (9th Cir.1962); *Puritan Ins. Co. v. Eagle S.S. Co. S.A.,* 779 F.2d 866, 870 (2d Cir.1985); *Gulfstream Cargo, Ltd. v. Reliance Ins. Co.,* 409 F.2d 974, 980–81 (5th Cir.1969); *Port Lynch, Inc. v. New England Int'l Assurety of America, Inc.,* 754 F.Supp. 816, 820 (W.D.Wash.1991). In applying *uberrimae fidei* in this case, we need not decide whether we do so as a matter of state law or federal law.

party judgment debtor. According to Polaris, the district court (Judge Letts) and Cigna, Allen, and Alliance were bound by the district court's earlier ruling (by Judge Tashima) denying Cigna's motion to declare DeGeorge an alter ego of Polaris and Inbanco. We disagree.

■ Contrary to Polaris's suggestion, a district court's prejudgment order is not entitled to preclusive effect in that court. *See Stifel, Nicolaus & Co., Inc., v. Woolsey & Co., Inc.,* 81 F.3d 1540, 1545 (10th Cir.1996) (prejudgment order "always remains subject to the trial judge's change before judgment is pronounced in the case"). "The district court is given broad discretion in supervising the pretrial phase of litigation, and its decisions regarding the preclusive effect of a pretrial order on issues of law and fact at trial will not be disturbed unless they evidence a clear abuse of discretion." *Miller v. Safeco Title Ins. Co.,* 758 F.2d 364, 369 (9th Cir.1985).

Moreover, Judge Tashima had not determined as a matter of fact or law that DeGeorge *was not* the alter ego of the defendants. The district court simply denied Cigna's pretrial motion to declare at that stage of the case that DeGeorge was an alter ego of the defendants because "such a declaration in this case, where CIGNA seeks no affirmative relief, would be pointless." Later in the litigation, after trial, when Cigna was awarded attorney fees, the alter ego issue was no longer "pointless" and the district court had discretion to consider the issue anew. It did so, and found that DeGeorge was the corporate defendants' alter ego. The court then added DeGeorge to the judgment as a non-party judgment debtor.

■ Polaris contends that Cigna's motion to name DeGeorge as a non-party judgment debtor was untimely according to Federal Rule of Civil Procedure 59(e). Rule 59(e)

provides, "Any motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment." We reject this argument because the motion to add DeGeorge as a judgment debtor did not go to the merits of the case. *See White v. New Hampshire Dept. of Empl. Sec.,* 455 U.S. 445, 451, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982) (motion for attorney fees does not go to the merits of the case; hence Rule 59(e) inapplicable).[4]

■ The proceeding to add DeGeorge as a judgment debtor on an alter ego theory was appropriate under Federal Rule of Civil Procedure 69(a). Rule 69(a) "permits judgment creditors to use any execution method consistent with the practice and procedure of the state in which the district court sits." *Peacock v. Thomas,* 516 U.S. 349, 116 S.Ct. 862, 869 n. 7, 133 L.Ed.2d 817 (1996). California allows motions to add alter-ego judgment debtors within a reasonable period of time. *Cf. Alexander v. Abbey of the Chimes,* 104 Cal.App.3d 39, 48–49, 163 Cal.Rptr. 377, 382 (1980)(without a reasonable explanation, and after a seven-year delay in seeking to amend judgment, granting the motion was an abuse of discretion).

■ The district court's order granting attorney fees was entered on October 29, 1996. Cigna's motion to amend the judgment to name DeGeorge as a non-party judgment debtor was filed on June 10, 1997. This was a delay of about seven and one-half months. We cannot say the district court abused its discretion in granting the motion. *See Home Indem. Co. v. Lane Powell Moss & Miller,* 43 F.3d 1322, 1331 (9th Cir.1995) (a decision on a motion to amend the judgment is reviewable for abuse of discretion).[5]

**CONCLUSION**

Polaris and Inbanco failed to disclose to Cigna any information regarding their princi-

---

4. Polaris argues that Rule 59(e) applies because Rule 69(a) provides, "any statute of the United States governs to the extent that it is applicable." *See* Fed.R.Civ.P. 69(a). This merely begs the question which *White* answers—in the negative.

5. Polaris does not contest the award of attorney fees except to argue that the award was wrongly

based on the district court's finding of fraud. However, the district court's fee award was based not only on what the court referred to as Polaris's fraud, but also on Polaris's introduction of "specious arguments and questionable testimony during the course of litigation" and "bad faith" use of the judicial process.

**422**

pal, DeGeorge. They did not disclose De-George's ownership interest in the *Principe,* his loss history, or the relationships among DeGeorge, Polaris, Inbanco and Tridon. These matters were material to the marine insurance contract, and the failure to disclose them violated the doctrine of *uberrimae fidei.* Accordingly, Cigna had a right to rescind the contract. We affirm the district court's rescission judgment on this ground.

There was ample evidence upon which to conclude that DeGeorge was the alter ego of Polaris and Inbanco. Amending the judgment to include DeGeorge as a non-party judgment debtor was not an abuse of discretion.

**AFFIRMED.**